E-FILED
11/17/2021 2:08 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
21CV391421
Reviewed By: A. Villanueva

ELISE R. SANGUINETTI, SBN 191389
JAMIE G. GOLDSTEIN, SBN 302479
ARIAS SANGUINETTI WANG & TORRIJOS, LLP
2200 Powell Street, Suite 740
Emeryville, CA 94608
Telephone: (510) 629-4877
Facsimile: (510) 291-9742

NICOLE L. JUDGE (JU005 – AL)
SLAVIK LAW FIRM, LLC
3001 South Lincoln Avenue
Suite C-1
Steamboat Springs, CO 80487
Telephone: (970) 457-1011
Facsimile: (267) 878-7697
*Pro Hac Vice Pending*

*Attorneys for Plaintiffs*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| DERRICK MONET, Individually and as the Personal Representative of the Estate of JENNA MONET, deceased<br><br>Plaintiff,<br><br>v.<br><br>TESLA, INC., and DOES 1 through 100, Inclusive,<br>Defendants. | CASE NO. 21CV391421<br><br>ORIGINAL COMPLAINT FOR DAMAGES FOR PERSONAL INJURY AND WRONGFUL DEATH<br><br>**DEMAND FOR JURY TRIAL** |

COMES NOW Plaintiff, Derrick Monet, Individually and as the Personal Representative of the Estate of Jenna Monet, deceased, for causes of action against Defendants, and each of them, and alleges as follows:



EXHIBIT A

## THE INCIDENT

1. On December 29, 2019, Derrick Monet and his wife, Jenna, were traveling from Arizona to Maryland. Derrick was driving his 2019 Tesla Model 3, using the vehicle's autosteer and traffic aware cruise control features, what Tesla calls its "Autopilot" system.

2. About a half hour after sunrise, at approximately 8:11 a.m., the couple crashed into the rear of a fire truck which was stopped in the left lane of westbound I-70 near the 38-mile marker in Putnam County, Indiana. The fire truck was on the scene of an earlier accident nearby.







3. Jenna died in the crash. Due to the injuries he received in this crash, Derrick has been discharged from the Air Force where he worked as a cryptographic language analyst. Derrick's injuries included nine fractures, including a lumbar vertebra, thoracic and cervical vertebrae, scapula, two ribs, and a right femur, which now has a rod implanted.

## BACKGROUND

4. Over three years prior to this incident, on October 19, 2016, Tesla Motors proclaimed,

> "We are excited to announce that, as of today, all Tesla vehicles produced in our factory – including Model 3 – will have the hardware needed for full self-driving capability at a safety level substantially greater than that of a human driver. Eight surround cameras provide 360 degree visibility around the car at up to 250 meters of range. Twelve updated ultrasonic sensors complement this vision, allowing for detection of both hard and soft objects at nearly twice the distance of the prior system. A forward-facing radar with enhanced processing provides additional data about the world on a redundant

> wavelength, capable of seeing through heavy rain, fog, dust and even the car ahead.
>
> To make sense of all of this data, a new onboard computer with more than 40 times the computing power of the previous generation runs the new Tesla-developed neural net for vision, sonar and radar processing software. Together, this system provides a view of the world that a driver alone cannot access, seeing in every direction simultaneously and on wavelengths that go far beyond the human senses."[1]

5. In interviews with reporters later that day (October 19, 2016), Tesla's CEO Elon Musk predicted, ". . . we will be able to demonstrate a demonstration drive of our full autonomy all the way from LA to New York. So basically, from home in LA to let's say dropping you off in Times Square, NY, and then having the car parking itself by the end of next year *(2017)* without the need for a single touch including the charger." [2]

6. On April 23, 2019, Musk said of Tesla's self-driving capability, "The key point of this is that any part of this could fail and the car would keep driving. So, you could have cameras fail, you could have power circuits fail, you could have one of the Tesla full self-driving computer chips fail, car keeps driving. The probability of this computer failing is substantially lower than someone losing consciousness. That's the key metric. At least an order of magnitude."[3]

7. On April 22, 2019, eight months before this incident, Tesla posted a video on its YouTube channel titled "Full Self-Driving" showing a Tesla driving entirely on its own.[4]

---

[1] *All Tesla Cars Being Produced Now Have Full Self-Driving Hardware*. Tesla Motors Blog, October 19, 2016. https://www.Tesla.com/blog/all-Tesla-cars-being-produced-now-have-full-self-driving-hardware. Last accessed 23 August 2021.

[2] *In a conference call with reporters: "Elon Musk Autopilot 2.0 Conference Call Transcript*. Xautoworld, October 19, 2016. http://www.xautoworld.com/Tesla/transcript-elon-musk-autopilot-2-conference-call/ Last accessed 23 August 2021.

[3] Elon Musk, *Tesla Autonomy Day 2019 - Full Self Driving Autopilot - Complete Investor Conference Event*, April 23, 2019. https://www.youtube.com/watch?v=-b041NXGPZ8 at minute 8:30-8:54. Last accessed 6 September 2021.

[4] *See*, Tesla, *Full Self-Driving*, YouTube video, 1:56, April 22, 2019, https://youtu.be/tlThdr3O5Qo. Last accessed 23 August 2021.

8. In reality, Tesla does not make a "Full Self-Driving" (FSD) vehicle and never has.[5] All Tesla vehicles simply provide driver assistance and are not capable of "driverless" operation. Tesla's claims and deliberate implications to the contrary are false. Tesla's descriptions of its various autonomous features have consistently maintained that Tesla's *intent* is for its customers to *believe* that all Teslas have or will very soon have autonomous systems that would allow the vehicle to operate without human intervention. Tesla deliberately blurs the distinction between whether its automation system is merely a "driver assist" system or an autonomous system that doesn't require the driver's constant attention.[6]

9. Several customers have sued Tesla for breaching its promise of a fully automated self-driving car and claim they have already paid for the feature.[7] Tesla privately acknowledges and has told California regulators that it is unlikely to offer fully autonomous features anytime in 2021.[8] Yet, Tesla has allowed some of its customers to access its Full Self-Driving system, even though Tesla has not been legally permitted to put autonomous vehicles on public roads.[9] One reason for Tesla's ambiguity as to the level of autonomy available in its vehicles is that without a great deal more testing and rigorous development, Tesla cannot openly sell a vehicle that doesn't require the driver's constant attention.[10] Therefore, Tesla's strategy has been to convince its prospective customers that Teslas have or will soon have the ability to drive themselves, while telling regulators that Tesla only sells vehicles with the same driver assist features as are used in various other brands of cars, all of which require constant driver

---

[5] *See, e.g.*, Andrew J. Hawkins, *Tesla privately admits Elon Musk has been exaggerating about 'full self-driving'*, THE VERGE, May 7, 2021. https://www.theverge.com/2021/5/7/22424592/tesla-elon-musk-autopilot-dmv-fsd-exaggeration. Last accessed 14 October 2021.

[6] William H. Widen and Philip Koopman, *Do Tesla FSD Beta Releases Violate Public Road Testing Regulations*?, JURIST – Academic Commentary, September 27, 2021, https://www.jurist.org/commentary/2021/09/william-widen-philip-koopman-autonomous-vehicles/ Last accessed 18 October 2021.

[7] *See*, Cade Metz, *Tesla Sells 'Full Self-Driving,' but What Is It Really?*, NEW YORK TIMES, August 23, 2021. https://www.nytimes.com/2021/08/20/technology/Tesla-full-self-driving-fsd.html Last accessed 23 August 2021.

[8] *Id.*

[9] William H. Widen and Philip Koopman, *Do Tesla FSD Beta Releases Violate Public Road Testing Regulations*?, JURIST – Academic Commentary, September 27, 2021, https://www.jurist.org/commentary/2021/09/william-widen-philip-koopman-autonomous-vehicles/. Last accessed 18 October 2021.

[10] *Id.*

attention.[11] According to Bryant Walker Smith, an associate professor in the Schools of Law and Engineering at the University of South Carolina, this raises the question, "If we can't trust Tesla when they say their vehicles are full self-driving, how can we trust the company when it says they are safe?"[12]

10. Long before this incident, advocates and other federal agencies have repeatedly called on the Federal Trade Commission to act on Tesla's possible false advertising of its driving automation systems.[13]

11. The Society of Automotive Engineers (SAE) defines six levels of driving automation ranging from "0" to "5".[14] These levels describe the degree to which the human driver controls the vehicle.[15] SAE Level 0 refers to vehicles operated totally by the driver with minimal assistance from automated warning systems.[16] SAE Level 5, the highest level, describes a fully automated vehicle that can drive everywhere in all conditions without human intervention.[17] The highest level of any vehicle currently operating on public roads is SAE Level 2, which requires constant human attention and regular intervention.[18]

12. While Tesla has hyped its vehicles' autonomous capabilities, the truth is, no Tesla actually exceeds SAE Level 2 automation, meaning all Tesla vehicles require constant driver attention and the ability to intervene at any second, even those designated as having a functional "Full Self-Driving" capacity. Tesla's repeated claims that its cars are capable of driving themselves imply a level of automation that does not yet exist in any vehicle on the road today.

---

[11] *Id.*
[12] *Id.*
[13] *See* Exhibit 2, 18 August 2021 Letter from the United States Senate to The Honorable Lina Khan, Chair, Federal Trade Commission.
[14] Jennifer Shuttleworth, *SAE Standards News: J3016 automated-driving graphic update,* SAE International, 7 January 2019 https://www.sae.org/news/2019/01/sae-updates-j3016-automated-driving-graphic Last accessed 23 August 2021.
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.*

13. This deception has not gone unnoticed. In 2018, the Center for Auto Safety and Consumer Watchdog wrote to then FTC Chairman Joseph Simons urging the FTC to investigate Tesla's deceptive and unfair practices in the advertising and marketing of Autopilot after two fatal crashes.[19] They renewed their request to the FTC in 2019 following additional fatal incidents.[20]

14. The National Highway Traffic Safety Administration (NHTSA) sent Musk a cease-and-desist letter in 2018 over his claims about the Tesla vehicles' safety and asked the FTC to investigate the claims.[21]

15. On August 13, 2021, NHTSA opened a formal investigation into Tesla's Autopilot feature after identifying 11 crashes with Autopilot engaged since 2018 that involved a Tesla striking one or more vehicles at first responder sites.[22] The NHTSA investigation includes this crash.[23] As part of their investigation NHTSA requested Tesla to provide responses to various information requests[24] and Tesla has requested to hide their response to the requests from the public.[25] Tesla, however, has known for years that "stopping for stationary objects [has] been a particularly difficult problem for Autopilot and other vision-based systems like Mobileye in the real world, and numerous drivers have rear-ended stopped vehicles such as highway patrol cars or fire trucks."[26]

---

[19] *Id.*, *citing* Jason Levine and John Simpson to the Honorable Joseph Simons, May 23, 2018, https://www.autosafety.org/ftc_investigation_request_Tesla_autopilot/ Last accessed 23 August 2021.

[20] *See* Exhibit 2, *citing* Jason Levine and Adam Scow to the Honorable Joseph Simons, July 25, 2019, https://www.autosafety.org/center-for-auto-safety-and-consumer-watchdog-renew-their-call-for-the-ftc-and-state-attorneys-general-to-investigate-Tesla-for-deceptive-practices-after-another-autopilot-related-death/ Last accessed 23 August 2021.

[21] *See* Exhibit 2, *citing* Sean O'Kane, *Feds told Tesla to stop misleading the public about Model 3 safety*, THE VERGE (Washington, D.C.) August 7, 2019, https://www.theverge.com/2019/8/7/20758349/Tesla-model-3-safety-misleading-ftc-national-highway-traffic-administration-elon-musk Last accessed 23 August 2021.

[22] *See attached* Exhibit 1, National Highway Traffic Safety Administration [NHTSA] ODI Resume for Investigation number PE 21-020.

[23] *Id.*

[24] *See attached* Exhibit 2, National Highway Traffic Safety Administration [NHTSA] Letter to Eddie Gates, Director, Field Quality, Tesla, Inc., August 31, 2021.

[25] USDOT Memorandum dated October 22, 2021, PE-21-020 Public File.

[26] Amir Efrati, *The 200 People Behind Tesla Autopilot*, THE INFORMATION, November 5, 2018, https://www.theinformation.com/articles/the-200-people-behind-tesla-autopilot. Last accessed 26 October 2021.

16. Despite the NHTSA investigation, and the mounting questions about the safety of Tesla's autonomous driving software and marketing, Tesla announced in September of 2021 that it would be expanding the availability of its Full Self-Driving feature. In response to Tesla's announcement of these plans, National Transportation Safety Board (NTSB) chair, Jennifer Homendy, said in an interview with the Wall Street Journal concerning Tesla's FSD, "basic safety issues have to be addressed before they're then expanding it to other city streets."[27] Homendy called Tesla's decision to call its system "Full Self-Driving" "misleading and irresponsible."[28] Homendy pointed out that people pay more attention to marketing than to warnings in car manuals or on a company's website.[29] According to Homendy, "[Tesla] has clearly misled numerous people to misuse and abuse technology."[30] NHTSA has followed up on their investigation following Tesla's distribution of functionality to certain Tesla vehicle models intended to improve detection of emergency vehicle lights in low light conditions, and Tesla's early October 2021 release of the Full Self-Driving Beta Request Menu option.[31] NHTSA also issued a Special Order Directed to Tesla, Inc., on October 12, 2021, ordering Tesla to produce various documents related to purported non-disclosure agreements between Tesla and its customers that prohibited or discouraged customers from sharing certain information relevant to the performance of FSD.[32]

17. The problems with partially automated driver assist systems, such as traditional cruise control, have been known to the automotive industry for decades.[33] Drivers tend to "drift off" and lose

---

[27] Rebecca Elliott, *Elon Musk's Push to Expand Tesla's Driver Assistance to Cities Rankles a Top Safety Authority*, THE WALL STREET JOURNAL, September 19, 2021, https://www.wsj.com/articles/elon-musks-push-to-expand-teslas-driver-assistance-to-cities-rankles-a-top-safety-authority-11632043803?mod=hp_lead_pos3 Last accessed 4 October 2021.
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *See attached* Exhibit 3, *Letter from Gregory Magno, Chief, Vehicle Defects Division -D, Office of Defects Investigation, NHTSA, to Eddie Gates, Director, Field Quality, Tesla, Inc.*, October 12, 2021.
[32] *See attached* Exhibit 4, National Highway Traffic Safety Administration [NHTSA] Letter & Special Order Directed to Tesla, Inc., to Bill Berry, Vice President, Legal, Tesla, Inc., October 12, 2021.
[33] Endsley, M. R., & Kaber, D. B. (1999) *Level of automation effects on performance, situation awareness and workload in a dynamic control task.* ERGONOMICS, *42*, 462–492; Kaber, D. B., & Endsley, M. R. (1997) *Out-of-the-loop performance problems and the use of intermediate levels of automation for improved control system functioning and safety.* PROCESS SAFETY

what experts call "situational" or "contextual" awareness when the car is on cruise control.[34] Reaction time, especially in emergencies, substantially increases when cruise control and speed limiters are activated.[35] Additionally, reaction times increase further as the level of automation increases.[36] Trust in the automated system will also slow reaction times, and this trust becomes reinforced when the automation performs relatively well.[37] Monet had used his AutoPilot on long freeway trips such as this a number of times without event, which led him to trust the system.

18. An even greater problem arises when the automated system suddenly fails without warning.[38] This situation was also researched extensively prior to Tesla ever making a car.[39] One study found that more than a third of drivers failed to regain control of the vehicle following an automation failure while using adaptive cruise control.[40]

---

PROGRESS, *16*, 126–131; Stanton, N. A., Young, M., & McCaulder, B. (1997) *Drive-by- wire: The case of driver workload and reclaiming control with adaptive cruise control.* SAFETY SCIENCE, *27*, 149–159; Stanton, N. A., & Young, M. S. (2005) *Driver behaviour with adaptive cruise control.* ERGONOMICS, *48*, 1294–1313; Young, M. S., & Stanton, N. A. (2002) *Malleable attentional resources theory: A new explanation for the effects of mental underload on performance*, HUMAN FACTORS, *44*, 365–375.

[34] *See fn. 14 supra.*

[35] See, e.g., *Cruise Control and Speed Limiters Impact Driver Vigilance*, VINCI AUTOROUTES FOUNDATION, 12 July 2013; *and* Young, M. S., & Stanton, N. A. (2007) *Back to the future: Brake reaction times for manual and automated vehicles.* ERGONOMICS, *50*, 46–58.

[36] Eriksson, A., & Stanton, N. A. (2017) *Takeover Time in Highly Automated Vehicles: Noncritical Transitions to and From Manual Control*, HUMAN FACTORS, June 2017 pp. 689-90.

[37] Morando, Gershon, Mehler, and Reimer, *A model for naturalistic glance behavior around Tesla Autopilot disengagements*, ELSEVIER, ACCIDENT ANALYSIS & PREVENTION, Volume 161, October 2021, 106384, https://www.sciencedirect.com/science/article/pii/S0001457521003791?via%3Dihub#! Last accessed 4 October 2021.

[38] Id. at p. 690.

[39] *Id.; citing* Desmond, P. A., Hancock, P. A., & Monette, J. L. (1998) *Fatigue and automation-induced impairments in simulated driving performance*, HUMAN PERFORMANCE, *User Information, and Highway Design*, *1628*, 8–14; Molloy, R., & Parasuraman, R. (1996) *Monitoring an automated system for a single failure: Vigilance and task complexity effects*, HUMAN FACTORS, *38*, 311–322; Stanton, N. A., Young, M., & McCaulder, B. (1997) *Drive-by- wire: The case of driver workload and reclaiming control with adaptive cruise control.* SAFETY SCIENCE, *27*, 149–159; Stanton, N. A., Young, M. S., Walker, G. H., Turner, H., & Randle, S. (2001) *Automating the driver's control tasks*, INTERNATIONAL JOURNAL OF COGNITIVE ERGONOMICS, *5*, 221–236; Young, M. S., & Stanton, N. A. (2007) *Back to the future: Brake reaction times for manual and automated vehicles*, ERGONOMICS, *50*, 46–58.

[40] Eriksson, A., & Stanton, N. A. (2017), *supra, citing* Stanton, N. A., Young, M., & McCaulder, B. (1997) *Drive-by- wire: The case of driver workload and reclaiming control with adaptive cruise control*, SAFETY SCIENCE, *27*, 149–159.

19. A driver who is driving manually without any automation must first see and recognize a sudden emergency.[41] This necessarily happens before the driver can begin any appropriate response to avoid the hazard.[42] Additionally, once the driver recognizes the potential hazard, the driver must decide the best action to take.[43] This might involve multiple choices, such as whether to brake or accelerate; or whether to steer right or left; or, even to do nothing at all.[44] This process takes time and is in addition to the time it takes for the vehicle to respond once the driver decides which action to take and begins taking it.[45] Between the time when the emergency registers in the driver's consciousness and when the driver actually applies the brakes, or turns the steering wheel, the vehicle has continued on its path toward the hazard.[46] The shorter the time between the driver becoming aware of a hazard and the hazard's potential to cause harm, the more likely the driver will fail to avoid or minimize the danger.[47]

20. This reaction time for a traditional, manual system increases once an automated system becomes involved.[48] Drivers using adaptive cruise control, SAE Level 1, have longer brake reaction times than those driving without this automation.[49] These reaction times increase for drivers with adaptive cruise control and assistive steering, SAE Level 2.[50] This additional time can be critical.[51] That extra time allows the vehicle to travel farther than the unautomated SAE Level 0 car during this critical reaction time.[52]

---

[41] Zhang, Winter, Varotto, Happee, & Martens, *Determinants of take-over time from automated driving: A meta-analysis of 129 studies*, ELSEVIER, Transportation Research Part F, (2019), 285-307, at 286.
[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] *Id. at* 298.
[48] *Id., and see*, Young, M. S., & Stanton, N. A. (2007) *Back to the future: Brake reaction times for manual and automated vehicles*, ERGONOMICS, *50*, 46–58.
[49] *Id.*
[50] *Id.*
[51] Willemsen, D., Stuiver, A., & Hogema, J. (2015, June) *Automated driving functions giving control back to the driver: A simulator study on driver state dependent strategies*. Paper presented at the 24th International Technical Conference on the Enhanced Safety of Vehicles, Gothenburg, Sweden.
[52] Bogna Szyk, *Stopping Distance Calculator*, Last updated: May 10, 2021

21. If, as in Tesla's case, the driver is led to believe the automated system, which Tesla itself calls "Autopilot" and "Full Self-Driving", provides greater control than traditional automated cruise control or traffic aware systems, the driver can be lulled into behaving as though the vehicle is actually an SAE Level 3 autonomous system when in reality it is still only a Level 2.[53] Tesla falsely creates the expectation that the Tesla is capable of identifying and safely negotiating situations the car is simply not capable of.[54] This is particularly dangerous because it takes significantly longer for a driver to transition from Level 3 automated controls, even perceived ones, and regain situational awareness in order to react to road conditions than it does for a driver using Level 2 automation.[55] Tesla, through its marketing, lulls its drivers to believe their Tesla will drive itself, and this misconception becomes reinforced when the automated system performs relatively well.[56] Thus, Tesla drivers can find themselves worse off than if they were using traditional cruise control or manual operations.[57]

22. The problems with SAE Level 3 autonomy became readily apparent in studies done by Waymo when it was tasked with developing an autonomous driving system for Google. In November of

---

*https://www.omnicalculator.com/physics/stopping-distance* Last accessed 23 August 2021.

[53] T.W. Victor, E. Tivesten, P. Gustavsson, J. Johansson, F. Sangberg, M. Ljung Aust, *30 Automation expectation mismatch: Incorrect prediction despite eyes on threat and hands on wheel*, HUMAN FACTORS, 60 (8) (2018), pp. 1095-1116, 10.1177/0018720818788164 ("a key component of driver engagement is cognitive (understanding the need for action), rather than purely visual (looking at the threat), or having hands on wheel.); R. Lin, L. Ma, W. Zhang, *An interview study exploring tesla drivers' behavioural adaptation*, APPLIED ERGONOMICS, 72 (2018), pp. 37-47, 10.1016/j.apergo.2018.04.006.

[54] *Is a self-driving car smarter than a seven-month-old?*, THE ECONOMIST, Science & Technology, September 2, 2021 edition, https://www.economist.com/science-and-technology/is-it-smarter-than-a-seven-month-old/21804141 Last accessed 5 October 2021. ("Autonomous vehicles are getting better, but they still don't understand the world in the way that a human being does. For a self-driving car, a bicycle that is momentarily hidden by a passing van is a bicycle that has ceased to exist."). *And see*, E.R. Teoh, *What's in a name? drivers' perceptions of the use of five SAE level 2 driving automation systems*, JOURNAL OF SAFETY RESEARCH, 72 (2020), pp. 145-151, 10.1016/j.jsr.2019.11.005.

[55] M. Kuehn, Tobias Vogelpohl, M. Vollrath (2017) *Takeover Times in Highly Automated Driving (Level 3)*. COMPUTER SCIENCE, Paper Number 17-0027, 25ESV-000027.pdf, https://www-esv.nhtsa.dot.gov/Proceedings/25/25ESV-000027.pdf. ("These reactions, which are required in order to understand the current traffic situation, are thus delayed by up to 5 seconds compared to the reactions of drivers in manual control in the same situation.") Last accessed 23 August 2021.

[56] B.D. Seppelt, T.W. Victor, *Potential solutions to human factors challenges in road vehicle automation*
G. Meyer, S. Beiker (Eds.), ROAD VEHICLE AUTOMATION 3, SPRINGER INTERNATIONAL PUBLISHING (2016), pp. 131-148, 10.1007/978-3-319-40503-2_11;
Victor et al., 2018, Teoh, 2020, Lin et al., 2018, Abraham et al., 2017, Abraham et al., 2017)

[57] B.D. Seppelt, B. Reimer, L. Russo, B. Mehler, J. Fisher, D. Friedman, *Consumer confusion with levels of vehicle automation*,10TH INTERNATIONAL DRIVING SYMPOSIUM ON HUMAN FACTORS IN DRIVER ASSESSMENT, TRAINING AND VEHICLE DESIGN (2019), 10.17077/drivingassessment.1723 Google Scholar.

2017 John Krafcik, Waymo's CEO, said that five years earlier, in 2012, he was developing assisted driving technology as a quick route to market.[58] As part of that development, Google's system would drive the vehicle on highways, then transfer responsibility back to a human on other roads or in circumstances beyond its programming [SAE Level "3" autonomous driving].[59] Krafcik admitted: "What we found was pretty scary. It's hard to take over because they [the drivers] have lost contextual awareness."[60] In a filmed experiment, Google's test drivers were seen playing with their phones and applying make-up at speeds up to 90km/h. One was even spotted napping at the wheel.[61] Not long after this test, management decided to focus solely on developing SAE Level 5 autonomous vehicle technology, which would require no active driver intervention.[62] The behavior of the Waymo drivers was consistent with that of Tesla Autopilot drivers interviewed in a 2018 study.[63]

23. Speaking in a fireside chat at the National Governors Association meeting July 20, 2018, Krafcik told the group, "There are no autonomous systems available, zero on the road today. Anything you can buy on the road today is a driver assist system, that means the driver is completely responsible for the car and I think there is so much confusion on that."[64] Krafcik was referring to some of the issues caused by consumers believing that the assist systems currently on the market are more capable than they

---

[58] Derek Fung, *Napping driver leads Google to end level-three Autonomous development*, DRIVE, 9 November 2017, https://www.drive.com.au/news/google-stopped-level-three-self-driving-rd-after-driver-napped-at-the-wheel/ Last accessed 23 August 2021.
[59] *Id.*
[60] *Id.*
[61] *Id.*;
[62] *Id.*
[63] R. Lin, L. Ma, W. Zhang, *An interview study exploring tesla drivers' behavioural adaptation*, APPLIED ERGONOMICS, 72 (2018), pp. 37-47, 10.1016/j.apergo.2018.04.006, ("Engagement in secondary tasks during partially automated driving was universal" among a group of 20 Tesla drivers with one to five months experience with Autopilot).
[64] Sam Abuelsamid. *Transition to Autonomous Cars Will Take Longer Than You Think, Waymo CEO Tells Governors*, FORBES, July 20, 2018. https://www.forbes.com/sites/samabuelsamid/2018/07/20/waymo-ceo-tells-governors-av-time-will-be-longer-than-you-think/#277b432cd7da Last accessed 23 August 2021.

actually are, most notably Tesla's Autopilot.[65] John Krafcik publicly admitted that autonomous vehicles might never work in all locations.[66]

24. In January of 2021 Waymo terminated its use of the term "self-driving" because it is misleading. Waymo said in its blog, "Unfortunately, we see that some automakers use the term "self-driving" in an inaccurate way, giving consumers and the general public a false impression of the capabilities of driver assist (not fully autonomous) technology. **That false impression can lead someone to unknowingly take risks (like taking their hands off the steering wheel) that could jeopardize not only their own safety but the safety of people around them."** [Emphasis added].[67]

25. A recent study from the Massachusetts Institute of Technology (MIT) corroborates these findings.[68] This study provided a comprehensive analysis of glance behavior during transitions from Tesla's AutoPilot (AP) to manual driving in non-critical highway driving.[69] The study's conclusions included that, "Changes in glance duration and pattern suggest a lower visual attention to the forward road when AP was engaged compared to after the disengagement to manual driving."[70]

## OTHER SIMILAR TESLA INCIDENTS INVOLVING AUTOPILOT

26. Tesla was and remains aware of the inadequacies and defects with its Autopilot system. Tesla has received notice of numerous similar failures in vehicles on the road in which the system permitted a collision with an object while the Autopilot was engaged, many times leading to injuries and deaths. Such events include, but are not limited to:

---

[65] *Id.*
[66] *Id.*
[67] Andrew J. Hawkins, *Waymo says it's ditching the term 'self-driving' in dig at Tesla*, THE VERGE, Jan 6, 2021. https://www.theverge.com/2021/1/6/22216848/waymo-change-self-driving-autonomous-language-Tesla Last accessed 23 August 2021.
[68] Morando, Gershon, Mehler, and Reimer, *A model for naturalistic glance behavior around Tesla Autopilot disengagements*, ELSEVIER, ACCIDENT ANALYSIS & PREVENTION, Volume 161, October 2021, 106384, https://www.sciencedirect.com/science/article/pii/S0001457521003791?via%3Dihub#! Last accessed 4 October 2021.
[69] *Id.*
[70] *Id.*

a. The January 20, 2016, crash of a Model S near Handan, China where the Tesla hit a street cleaning truck;[71]

b. the May 7, 2016, crash of a Model S near Williston, Florida where the Tesla hit a semi tractor trailer turning across the lane in front of it;[72]

c. the August 5, 2016, crash of a Model S into a car in China;[73]

d. the January 29, 2017, crash of a Model X into a guardrail and tree in China;[74]

e. the March 2, 2017, crash of a Model S in Dallas County, Texas where the Tesla hit lane barriers on a highway;[75]

f. the March 7, 2017, crash of a Model X into a van in China;[76]

g. the January 22, 2018, a Model S on Autopilot failed to brake and crashed into the back of a firetruck in Culver City, California.[77]

h. the March 23, 2018, crash of a Model X near Mountain View, California where the Tesla hit a barrier divider;[78]

i. the April 29, 2018, crash of a Model X near Tokyo, Japan where the Tesla hit a pedestrian and a vehicle in front of it on a highway;[79]

---

[71] Neal E. Boudette, *Autopilot Cited in Death of Chinese Tesla Driver,* NEW YORK TIMES, September 14, 2016. https://www.nytimes.com/2016/09/15/business/fatal-Tesla-crash-in-china-involved-autopilot-government-tv-says.html Last accessed 23 August 2021.

[72] Danny Yadron and Dan Tynan, *Tesla driver dies in first fatal crash while using autopilot mode,* THE GUARDIAN, June 30, 2016. https://www.theguardian.com/technology/2016/jun/30/Tesla-autopilot-death-self-driving-car-elon-musk Last accessed 23 August 2021.

[73] Tycho de Feijter, *"First Tesla Autopilot Crash In China,"* CARNEWSCHINA.COM, August 5, 2016. https://carnewschina.com/2016/08/05/first-tesla-autopilot-crash-in-china/ Last accessed 6 September 2021.

[74] W.E. Ning, *"Tesla Model X Crashes Into A Tree In China, Penetrated By Guardrail,"* CARNEWSCHINA.COM, March 27, 2017, https://carnewschina.com/2017/03/27/tesla-model-x-crashes-into-a-tree-in-china-penetrated-by-guardrail/ Last accessed 6 September 2021.

[75] Fred Lambert, *Tesla Autopilot crash caught on dashcam shows how not to use the system,* ELECTREK, March 2, 2017 https://electrek.co/2017/03/02/Tesla-autopilot-crash-video-how-note-to-use/ Last accessed 23 August 2021.

[76] Joey Wang, *Tesla Model X Hits Van In China, Autopilot Blamed,* CARNEWSCHINA.COM, March 9, 2017, https://carnewschina.com/2017/03/09/tesla-model-x-hits-van-in-china-autopilot-blamed/ Last accessed 23 August 2021.

[77] Fred Lambert, *Tesla Subject Vehicle reportedly on Autopilot crashes into fire truck at 65 mph, no injury,* ELECTREK, January 22, 2018. https://electrek.co/2018/01/22/Tesla-model-s-autopilot-crash-fire-truck/ Last accessed 23 August 2021.

[78] Mark Osborne, *Tesla car was on autopilot prior to fatal crash in California, company says,* ABC NEWS, March 30, 2018. https://abcnews.go.com/US/Tesla-car-autopilot-prior-fatal-crash-california-company/story?id=54142891 Last accessed 23 August 2021.

[79] Brad Anderson, *Tesla Autopilot Blamed On Fatal Japanese Model X Crash,* CARSCOOPS, April 30, 2020. https://www.carscoops.com/2020/04/Tesla-autopilot-blamed-on-fatal-japanese-model-x-crash/ Last accessed 23 August 2021.

j. the May 11, 2018, crash of a Model S which slammed into a stopped fire truck at 60 mph while on autopilot near Salt Lake City, Utah;[80]

k. the May 25, 2018, crash of a Model 3 while on autopilot in Greece;[81]

l. the May 29, 2018, crash of an unknown Model Tesla into a stationary police car while on autopilot in California;[82]

m. the October 12, 2018, crash of a Model S near Orlando, Florida where the Tesla hit a vehicle in front of it on a highway;[83]

n. The January 30, 2019, crash of a Model X in Holland when the driver using an "Autosteer System" did not look forward for a few seconds, did not pay attention to the road and passed the double solid line.[84]

o. the March 1, 2019, crash of a Model 3 near Delray Beach, Florida where the Tesla hit a semi-tractor trailer turning across the lane in front of it;[85]

p. the April 25, 2019, crash of a Model S which blew through an intersection and killed a pedestrian in the Florida Keys;[86]

q. the July 6, 2019, crash of a Model S in Arcadia, California, when the autopilot suddenly malfunctioned and caused the vehicle to swerve into the median, causing serious injuries to the petite driver;[87]

r. the August 9, 2019, crash of a Model S into a tow truck in Russia while on autopilot;[88]

---

[80] Marco della Cava, *Tesla driver in Utah crash kept taker her hands off wheel as car sped in Autopilot mode*, USA TODAY, May 16, 2018. https://www.usatoday.com/story/tech/talkingtech/2018/05/16/nhtsa-looking-into-Tesla-crash-utah/617168002/ Last accessed 23 August 2021.

[81] Fred Lambert, *Tesla Model 3 unofficial road trip ends in crash, driver blames Autopilot*, ELECTREK, May 25, 2018, https://electrek.co/2018/05/25/tesla-model-3-unofficial-road-trip-crash-driver-blames-autopilot/ Last accessed 23 August 2021.

[82] Olivia Solon, *Tesla that crashed into police car was in 'autopilot' mode, California official says*, THE GUARDIAN, 29 May 2018, https://www.theguardian.com/technology/2018/may/29/tesla-crash-autopilot-california-police-car Last accessed 6 September 2021.

[83] Gal Tziperman, *Winter Garden man suing Tesla for autonomous driving crash*, ORLANDO SENTINEL, October 30, 2018. https://www.orlandosentinel.com/news/breaking-news/os-ne-Tesla-autopilot-lawsuit-autonomous-driving-20181030-story.html Last accessed 23 August 2021.

[84] *Guilt in traffic*. EAST BRABANT DISTRICT COURT, March 3, 2019. https://linkeddata.overheid.nl/front/portal/document-viewer?ext-id=ECLI:NL:RBOBR:2019:5057 Last accessed 23 August 2021.

[85] Fred Lambert, *Tesla Model 3 driver again dies in crash with trailer, Autopilot not yet ruled out*, ELECTREK, *March 1, 2019*. https://electrek.co/2019/03/01/Tesla-driver-crash-truck-trailer-autopilot/ Last accessed 23 August 2021.

[86] David Goodhue and David Ovalle, *Was a Tesla on autopilot when it killed a pedestrian in the Keys? FHP is checking*, MIAMI HERALD, June 1, 2019. https://amp.miamiherald.com/news/local/community/florida-keys/article230945733.html?_twitter_impression=true Last accessed 23 August 2021.

[87] Hsu v. Tesla, Inc., No. 20STCV18473, SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF LOS ANGELES, filed May 14, 2020.

[88] *3 injured as Tesla goes up in flames & explodes on Moscow freeway*, RT.COM, 11 August 2019, https://www.rt.com/russia/466247-tesla-blast-moscow-injured/ Last accessed September 6, 2021.

s. the August 24, 2019, crash involving a Ford pickup that was struck from behind by a Model 3 that was traveling about 60 mph on Autopilot. Neither the autopilot nor the driver slowed the vehicle until a fraction of a second before the crash. The crash occurred in California;[89]

t. the September 17, 2019, crash involving an unknown Tesla Model that drove into oncoming traffic in Florida, autopilot was alleged;[90]

u. the December 7, 2019, crash of a Model 3 into a parked State Police car while on autopilot in Connecticut;[91]

v. the December 30, 2019, crash of a Model 3 into a stopped police car in Massachusetts;[92]

w. the May 4, 2020, crash of a Model S when the driver of the Tesla had the car steering on when he hit and killed a trailer driver in Norway;[93]

x. the May 31, 2020, crash of a Model 3 that drove into an overturned semi trailer;[94]

y. the June 21, 2020, crash of a Model 3 when the Tesla veered into the other lane, and crashed into an oncoming car in Germany;[95]

z. the July 14, 2020, crash of a Model S that drove into an Arizona police SUV, which was then pushed into an ambulance;[96]

aa. the August 12, 2020, crash of a Model 3 that rear-ended a Sienna minivan repeatedly, causing the minivan to spin out of control in Saratoga, California. The Tesla continued

---

[89] Neal E. Boudette, *Tesla says Autopilot Makes Its Cares Safer. Crash Victims Say It Kills,* NEW YORK TIMES, July 5, 2021 https://www.nytimes.com/2021/07/05/business/Tesla-autopilot-lawsuits-safety.html Last accessed 23 August 2021.

[90] Cristobal Reyes, *Woman killed in Osceola County crash while trying to pass traffic, FHP says,* ORLANDO SENTINEL, September 17, 2019, https://www.orlandosentinel.com/news/osceola-county/os-ne-osceola-polk-line-road-fatal-crash-20190918-m5hgbty6l5csfe2qo3mlmxr7sa-story.html Last accessed September 6, 2021.

[91] Alfred Branch, *Tesla In 'Auto Pilot' Plows Into State Police Cruiser in Norwalk,* PATCH, December 7, 2019, https://patch.com/connecticut/norwalk/tesla-auto-pilot-plows-state-police-cruiser-norwalk Last accessed 6 September 2021.

[92] *2 Drivers Cited After State Police Cruisers Hit On Route 24, Mass Pike,* CBS BOSTON, December 31, 2019, https://boston.cbslocal.com/2019/12/31/massachusetts-state-police-cruisers-hit-crashes-mass-pike-warren-route-24-west-bridgewater/ Last accessed 6 September 2021.

[93] Geir Roed, *Tesla on auto-steering when man was cut down,* MOTOR, December 18, 2020 https://motor.no/autopilot-nyheter-Tesla/Tesla-pa-auto-styring-da-mann-ble-meid-ned/188623 Last accessed 23 August 2021.

[94] Fred Lambert, *Video of Tesla Model 3 crashing into a truck on Autopilot goes viral,* ELETRECK, June 1, 2020, https://electrek.co/2020/06/01/tesla-model-3-crashing-truck-autopilot-video-viral/ Last accessed 7 September 2021.

[95] *Update: Fatal accident on S255: Investigation against Tesla driver for negligent homicide,* FREIE PRESSE, June 22, 2020 https://www.freiepresse.de/drei-tote-bei-unfall-auf-autobahnzubringer-bei-aue-artikel10894951 Last accessed 23 August 2021.

[96] Ethan Baron, *Tesla on 'Autopilot' hits police vehicle which hits ambulance, driver possibly drunk: police,* BAY AREA NEWS GROUP, July 14, 2020. https://www.mercurynews.com/2020/07/14/tesla-on-autopilot-hits-police-vehicle-which-hits-ambulance-driver-possibly-drunk-police/ Last accessed 4 October 2021.

traveling down the freeway off-ramp, striking a pickup at an intersection before winding up on the off-ramp embankment and catching fire, killing both occupants;[97]

bb. the August 26, 2020, crash of an unidentified Tesla Model into a North Carolina police car while the Tesla driver was watching a movie while on autopilot;[98]

cc. the December 10, 2020, crash of a Model X into apartment garage wall in Seoul, South Korea. The Tesla ignited, killed a passenger and injured 2 others; firefighters couldn't open the door to extract the passenger because electronic door lock system was inoperable due to fire;[99]

dd. the February 27, 2021, crash of a 2019 Tesla into four vehicles including police cars in Texas;[100]

ee. the March 17, 2021, crash of a Model 3 into a stopped police car in Michigan;[101]

ff. the April 17, 2021, crash of a Model S which was traveling along a curve at a high rate of speed before crashing into a tree in the Woodlands near Houston, Texas;[102]

gg. the May 5, 2021, crash of a Model 3 which struck an overturned semi on State Highway 210 in California;[103]

hh. the May 19, 2021, when a Tesla crashed into a Road Ranger in Florida;[104]

ii. the July 10, 2021, when a Tesla on autopilot crashed into a California Highway Patrol vehicle;[105]

---

[97] *David Brown Killed in Fiery Crash on Highway 85 [Saratoga, CA]*, SWEETJAMES.COM, August 12, 2020 https://sweetjames.com/2020/08/17/david-brown-killed-fiery-crash-highway-85-saratoga-ca/ Last accessed 23 August 2021.

[98] Simone Jasper, *Tesla driver crashes into cop car while watching movie on autopilot, NC officials say*, THE NEWS & OBSERVER, August 26, 2020, https://www.newsobserver.com/news/state/north-carolina/article245267595.html Last accessed 7 September 2021.

[99] Kim Min-Joong, *Police ramp up investigation into fatal conflagration of Tesla Model X*, KOREA JOONGANG DAILY, December 24, 2020 https://koreajoongangdaily.joins.com/2020/12/24/business/industry/Tesla/20201224184400725.html Last accessed 23 August 2021.

[100] Jose Gonzalez, *Montgomery County deputies evade serious injury in Tesla crash*, THE COURIER, March 2, 2021, https://www.yourconroenews.com/neighborhood/moco/news/article/Montgomery-County-deputies-evade-serious-injury-15992663.php Last accessed 7 September 2021.

[101] Associated Press, *Tesla on autopilot crashes into Michigan trooper's patrol car*, DETROIT FREE PRESS, March 17, 2021, https://www.freep.com/story/news/local/michigan/2021/03/17/tesla-autopilot-crash-michigan-state-police-patrol-car/4731376001/ Last accessed 7 September 2021.

[102] Lucas Manfredi, *Deadly Texas crash involving Tesla worth $80,000 sparks 4-hour fire*, FOX BUSINESS, April 18, 2021 https://www.foxbusiness.com/lifestyle/two-killed-in-driverless-Tesla-crash Last accessed 23 August 2021.

[103] Gustavo Henrique Ruffo, *NHTSA To Investigate Fatal Tesla Crash Involving Overturned Truck, INSIDEEVS, May 13, 2021* https://insideevs.com/news/507038/nhtsa-investigate-Tesla-crash-california/ Last accessed 23 August 2021.

[104] Amanda Batchelor, *3 injured after Tesla collides with road ranger truck on I-95*; LOCAL 10 NEWS, May 19, 2021, https://www.local10.com/news/local/2021/05/19/3-injured-after-tesla-collides-with-road-ranger-truck-on-i-95/ Last accessed 7 September 2021.

[105] *Woman Suspected of DUI Arrested After Crashing into CHP Vehicle on SR-56*, TIMES OF SAN DIEGO, July 10, 2021, https://timesofsandiego.com/crime/2021/07/10/woman-suspected-of-dui-arrested-after-crashing-into-chp-vehicle-on-sr-56/ Last accessed 7 September 2021.

jj. the July 19, 2021, crash of a Model 3 that backed into a parking spot and was supposed to pull forward on its own and veer to the right, but instead, it unexpectedly went left in Fresno, California;[106]

kk. the July 25, 2021, crash of a Model X which was in a 25 mph speed zone and came across a fork in the road. The vehicle kept going straight, entered gravel and smashed into a boulder. The driver said that park rangers told him that four other Teslas had accidents at same exact spot in Yosemite.[107]

ll. the July 26, 2021, crash of a Model Y that struck and killed a man who was changing his tire by the side of the road in New York;[108]

mm. the August 28, 2021, crash of a Model 3 into a parked police car in Florida while on autopilot;[109]

nn. the September 16, 2021, incident involving an unidentified Model in which a woman apparently passed out and was being followed by California Highway Patrol.[110]

## TESLA'S LACK OF EFFECTIVE AUTOMATIC EMERGENCY BRAKING (AEB) SYSTEM

27. All Tesla vehicles, including the 2019 Model 3 which is the subject of this lawsuit, utilize a regenerative braking system. The brakes are controlled by one or more computers in the vehicle that can activate and deactivate them, whether or not the driver is pressing on the brake pedal.

28. Another defect that was a contributing cause to this crash is the lack of an *effective* Automatic Emergency Braking (AEB) system to perform as anticipated by the ordinary consumer.[111]

---

[106] Shelby Bracho, *Man's Tesla crashes into pole using 'smart summon' valet feature*, FOX 26 NEWS, July 25, 2021 https://kmph.com/news/local/mans-Tesla-crashes-into-pole-using-smart-summon-valet-feature Last accessed 23 August 2021.

[107] u/BBFLG, *5 Tesla Accidents in Same Location in Yosemite*, REDDIT, August 3, 2021 https://www.reddit.com/r/SelfDrivingCars/comments/oxhbit/5_Tesla_accidents_in_same_location_in_yosemite/ Last accessed 23 August 2021.

[108] Tom Krisher, *Feds probe NY Tesla crash that killed man changing flat tire*, AP NEWS, September 3, 2021, https://apnews.com/article/technology-business-6127ae797c528ca1d5322efc43439a12 Last accessed 7 September 2021.

[109] Lora Kolodny, *A Tesla Model 3 hit a parked police car in Orlando, driver said she was 'in Autopilot', CNBC, August 28, 2021*, https://www.cnbc.com/2021/08/28/tesla-model-3-hit-a-parked-police-car-in-orlando-driver-said-she-was-in-autopilot.html Last accessed 7 September 2021.

[110] Christiane Cordero, *Audio captures moments CHP stopped apparently passed out driver of Tesla on Autopilot in Glendale*, EYEWITNESS NEWS ABC, September 17, 2021, https://abc7.com/tesla-autopilot-passed-out-driver-glendale-los-angeles/11028280/ Last accessed 4 October 2021.

[111] Russ Mitchell, *A Tesla mystery: Why didn't auto-braking stop these crashes?*, LOS ANGELES TIMES, October 7, 2021, https://www.latimes.com/business/story/2021-10-07/why-arent-automatic-braking-systems-stopping-deadly-tesla-crashes Last accessed 7 October 2021.

Despite the fact that Tesla is marketed and sold as a state-of-the-art vehicle, multiple other manufacturers, including makers of much less expensive models, like Subaru, Mazda, Chrysler, Mitsubishi, and Honda, had made AEB safety features available by the 2019 Model Year.[112] Tesla knew before this event, and knows of events since this one where the lack of an *effective* Automatic Emergency Braking in their vehicles allowed a crash to occur that should have otherwise been avoided or reduced in severity. Each of the above referenced events in which the vehicle crashed into a vehicle, building, or other structure in front of it was notice to Tesla of the defect.

**TESLA'S AUTOPILOT SYSTEM LACKS APPROPRIATE SAFEGUARDS**

29. Despite Tesla's claims that its Level 2 autonomous system is safer than others on the market, the truth is, other manufacturers' systems provide substantially more safeguards than Tesla's. Tesla's Autopilot is simply a traffic aware cruise control system, sometimes called "adaptive cruise control," that has become common in today's cars.[113] Even if a car didn't initially come with one, it can be installed on many models.[114]

30. Adaptive cruise control [ACC] uses sensors such as cameras and radar to monitor a car's speed and steering in certain traffic situations.[115] Unlike traditional cruise control, ACC assists the driver to stay within the lane, avoid other vehicles and barriers, and, in combination with other systems, such as Automatic Emergency Braking, helps the driver avoid mishaps.[116] These systems fall within the SAE Level 2 category.

---

[112] Austin Lott, *Least Expensive Cars With Active Safety Systems*, MOTORTREND, April 22, 2015 https://www.autotrader.com/best-cars/8-least-expensive-cars-automatic-braking-239967 http://motortrend.com/news/least-expensive-cars-with-active-safety-systems/ https://consumerreports.org/cro/magazine/2015/04/cars-that-can-save-your-life/index.htm Last accessed 23 August 2021.

[113] Hearst Autos Research, *Cars with Adaptive Cruise Control: Everything You Need to Know*, CAR & DRIVER 2021. https://www.caranddriver.com/research/a31996248/cars-with-adaptive-cruise-control/ Last accessed 23 August 2021.

[114] *Id.*

[115] *Id.*

[116] *Id.*

31. However, as pointed out above, these systems come at a cost because they reduce driver attention and delay reaction time should the systems fail.[117] To offset this problem, some manufacturers have developed ways to monitor the driver's behavior to better insure the driver is as alert as possible so that they can assume full control of the vehicle if the system fails. Rather than encourage drivers to trust the automated systems, as Tesla has done, others in the automotive industry work hard to remind drivers that they must remain focused, with hands on the steering wheel, ready to take emergency action at all times.

32. Some systems monitor the driver's direction of vision and use auditory and tactile warnings to alert the driver if their gaze wonders from the road. These systems will disconnect the autonomous features if the driver doesn't respond.[118] For instance, GM's Super Cruise has an attention tracking system in the front seat, including infrared emitters and a camera on the steering wheel that monitors eye gaze and head position, and shuts down if the driver fails to respond to visual and audible warnings.[119] Ford and Subaru have similar technology.[120] Since the crash that forms the basis of this action, Tesla has now turned on a driver monitoring camera in some of its vehicles and updated its software to recognize emergency responder vehicle lights at night.[121] Tesla added this function only *after* NHTSA launched its investigation of Tesla crashes into emergency vehicles.[122] NHTSA has formally asked Tesla to explain

---

[117] *See, e.g., footnotes 14-38 supra.*
[118] *See* Sasha Lekach, *GM's Super Cruise feels like it's self-driving, but it's not; It's dangerous to think the car is in control*, MASHABLE, February 9, 2021. https://mashable.com/article/gm-super-cruise-advanced-driving-system. Last accessed 23 August 2021.
[119] *Id.*
[120] *See*, Jessica Choksey, *What is Subaru DriverFocus Technology?* J.D. POWER, June 25, 2020. https://www.jdpower.com/cars/shopping-guides/what-is-subaru-driverfocus-technology Last accessed 23 August 2021.
[121] Ramey, *Tesla Autopilot Will Now Detect Emergency Lights, but Only at Night*, AUTOWEEK, 22 September 2021, https://www.autoweek.com/news/green-cars/a37694444/tesla-autopilot-will-now-detect-emergency-lights-but-only-at-night/ Last accessed 7 October 2021.
[122] *See attached* Exhibit 1, National Highway Traffic Safety Administration [NHTSA] ODI Resume for Investigation number PE 21-020.

why it did not comply with 49 U.S.C. § 30118 by filing the required recall notice in connection with this update.[123]

33. Consumer Reports now provides an annual analysis of active driving assistance systems. Their evaluations place great emphasis on a system's ability to monitor whether the driver is paying attention.[124] Consumer Reports' manager of safety policy, William Wallace, stated, "The evidence is clear: If a car makes it easier for people to take their attention off the road, they're going to do so – with potentially deadly consequences."[125] Wallace continued, "It's critical for active driving assistance systems to come with safety features that actually verify drivers are paying attention and are ready to take action at all times. Otherwise, these systems' safety risks could end up outweighing their benefits."[126]

34. Consumer Reports recently tested one of Tesla's latest iterations of its "Full Self-Driving" software and reported the software lacks safeguards and raises concerns the system's use on public roads "puts the public at risk."[127] The article states, "Videos of FSD Beta 9 in action don't show a system that makes driving safer or even less stressful," says Jake Fisher, senior director of Consumer Reports' Auto Test Center. "Consumers are simply paying to be test engineers for developing technology without adequate safety protection."[128] Tesla has released additional versions of its FSD, the latest being FSD Beta

---

[123] *See attached* Exhibit 3, *Letter from Gregory Magno, Chief, Vehicle Defects Division -D, Office of Defects Investigation, NHTSA, to Eddie Gates, Director, Field Quality, Tesla, Inc.*, October 12, 2021. ("This recall notice must be filed with NHTSA no more than five working days after the manufacturer knew or should have known of the safety defect or noncompliance. *See* 49 C.F.R. § 573.6(b); *see also United States v. General Motors Corp.*, 656 F. Supp. 1555, 1559 n.5 (D.D.C. 1987). Any manufacturer issuing an over-the-air update that mitigates a defect that poses an unreasonable risk to motor vehicle safety is required to timely file an accompanying recall notice to NHTSA pursuant to 49 U.S.C. § 30118 and 49 C.F.R. Part 573.")

[124] Mike Monticello, *Cadillac's Super Cruise Outperforms Other Driving Assistance Systems*, CONSUMER REPORTS, October 28, 2020. https://www.consumerreports.org/car-safety/cadillac-super-cruise-outperforms-other-active-driving-assistance-systems/ Last accessed 23 August 2021.

[125] *Id.*

[126] *Id.*

[127] David Shepardson, *Consumer Reports says Tesla's 'Full Self-Driving' software lacks safeguards*, REUTERS 7/20/2021 https://www.reuters.com/business/autos-transportation/consumer-reports-says-Teslas-full-self-driving-software-lacks-safeguards-2021-07-20/ Last accessed 23 August 2021.

[128] Keith Barry, *Tesla's 'Full Self-Driving' Beta Software Used on Public Roads Lacks Safeguards, Consumer Reports' car safety experts worry that Tesla continues to use vehicle owners as beta testers for its new features, putting others on the road at risk*, CONSUMER REPORTS July 19, 2021. https://www.consumerreports.org/car-safety/Tesla-full-self-driving-beta-software-lacks-safeguards-a6698414036/ Last accessed 23 August 2021.

10.3. However, only days after the release of this version, Tesla pulled it and rolled back to FSD Beta 10.2 because of "issues" including complaints of false crash warnings.[129]

35. Further, Tesla uses onscreen graphics as part of its Autopilot system which appear on the large monitor used by the driver to operate many vehicle functions. Fisher is not alone in believing that "Tesla should at the very least be monitoring drivers in real time to ensure that they're paying attention while using new software."[130] For example, Fisher says the updated software has "impressive" onscreen graphics, but he's worried that even a brief glance by the driver at the display might be too long to prevent the system from crashing into a car or pedestrian.[131]

36. Among the most troubling aspects of Tesla's claims that its "Autopilot" and "Full Self-Driving" features are safer than other vehicles with automated features, is that Tesla jealously guards its information as to the incidents in which the FSD system has failed.[132] For example, Tesla requires those with access to the car's FSD Early Access Program (EAP) system to sign a non-disclosure agreement that specifically prohibits them from speaking to the media or giving test rides to the media.[133] Tesla also specifically discourages its owners from sharing video of automated feature mistakes.[134] Without accurate data about incidents in which Tesla's automation system has failed, assessment of Tesla's claims of its safety become impossible to verify and therefore meaningless. Tesla's efforts to limit public disclosure of

---

[129] Richard Lawler, *Tesla pulled its latest 'Full Self Driving beta after testers complained about false crash warnings and other bugs*, THE VERGE, October 24, 2021, https://www.theverge.com/2021/10/24/22743628/elon-musk-tesla-fsd-beta-10-3-rollback-issues-phantom-fcw Last accessed 26 October 2021.
[130] *Id.*
[131] *Id.*
[132] O'Kane, *Tesla asks owners to share fewer clips of 'Full Self-Driving' beta mistakes*, THE VERGE, September 28, 2021, https://www.theverge.com/2021/9/28/22696463/tesla-fsd-beta-nda-video-clips-controversy-full-self-driving Last accessed 4 October 2021.
[133] Aaron Gordon, *How Tesla's 'Self-Driving' Beta Testers Protect the Company From Critics*, VICE, September 27, 2021, https://www.vice.com/en/article/m7ezxq/how-teslas-self-driving-beta-testers-protect-the-company-from-critics Last Accessed 4 October 2021.
[134] *See* O'Kane, *supra* note 108.

safety information have caught the attention of NHTSA, resulting in a Special Order Directed To Tesla, Inc, issued 12 October 2021.[135]

37. As stated by the drafters of the 18 August 2021 Letter from the U.S. Senate to the Federal Trade Commission, "Tesla and Mr. Musk's repeated overstatements of their vehicle's capabilities – despite clear and frequent warnings – demonstrate a deeply concerning disregard for the safety of those on the road and require real accountability. Their claims put Tesla drivers – and all of the travelling public – at risk of serious injury or death. In light of these concerns, we urge you to swiftly open an investigation into Tesla's repeated and overstated claims about their

Autopilot and Full Self-Driving features and take appropriate enforcement action to prevent further injury or death as a result of any Tesla feature."[136]

**PARTIES**

38. At all times herein mentioned, Plaintiff Derrick Monet was the husband of Jenna Monet, and was and is a resident of the State of Arizona.

39. At the time of this incident, Derrick was a cryptographic language analyst in the Air Force, based in Fort Mead, in Mead, Maryland. He was discharged October 3rd, 2021, due to the injuries he received in this crash, which included nine fractures, including a lumbar (fusion), thoracic and cervical vertebrae, scapula, two ribs, and a right femur, which now has a rod implanted.

40. Plaintiff is informed and believes, and thereupon alleges, that Defendant Tesla is, and at all times herein relevant was, a Delaware corporation, with one of its principal places of business in Santa Clara County, California. Tesla is authorized to do, has regularly done, and is doing, business in the State

---

[135] *See* Exhibit 4, *fn. 25*, *supra*.
[136] *See* Exhibit 2, 18 August 2021 Letter from the United States Senate to The Honorable Lina Khan, Chair, Federal Trade Commission.

of California, and has systematically conducted business on a regular basis in the State of California, under and by virtue of the laws of the State of California.

41. Defendant Tesla is an American multinational corporation, founded in 2003, based in California, specializing in, among other things, the design, manufacture and sale of all-electric powered cars to be used on the streets and highways of this and other countries. Its products include the Roadster, the Model S sedan, the Model 3 sedan, and the Model X crossover SUV.

## GENERAL ALLEGATIONS

42. Plaintiff realleges as though fully set forth at length and incorporated herein by reference all of the allegations and statements contained hereinabove.

43. The events giving rise to this cause of action occurred on or about December 29, 2019, at approximately 8:11 a.m., at the 38.4-mile marker of eastbound Interstate 70, in the city of Cloverdale, County of Putnam, State of Indiana (hereinafter called "the Subject Incident" or "the incident").

44. At the time of the incident, Derrick Monet was the owner of the 2019 blue Tesla Model 3 bearing Arizona license plate number 5F92AF, Vehicle Identification Number 5YJ3E1EB3KF452611 (sometimes called the "Subject Vehicle"). Defendant Tesla, Inc. (formerly known as Tesla Motors, Inc.; sometimes called "Tesla") was the designer, manufacturer and seller of this vehicle. Derrick purchased the vehicle in Monterey, California.

45. At the time of the crash the subject vehicle's event data recorder showed that the vehicle had been running for 78.5 minutes. It also showed that both passengers were belted. The data log shows the autosteer and traffic aware cruise control features were activated at 7:49 a.m. and were functioning at the time of the crash.

46. The full extent of the facts linking such fictitiously sued Defendants with the causes of action alleged herein are unknown to Plaintiff. Plaintiff is informed and believes, and thereupon alleges,

that each of the Defendants designated herein as a DOE was and is negligently, carelessly, recklessly, unlawfully, tortuously, wantonly, wrongfully, illegally, or in some other actionable manner, responsible for the events and happenings referred to herein, and thereby negligently, carelessly, recklessly, unskillfully, unlawfully, tortuously, wantonly, wrongfully and illegally proximately caused the herein described incident and injuries and damages to the Plaintiff. Plaintiff will hereinafter seek leave of Court to amend this Complaint to show said Defendants' true names and capacities after these have been ascertained.

47. Plaintiff is informed and believes, and based thereupon alleges, that at all times mentioned herein, Defendants, and each of them, including DOES 1 through 100, inclusive, and each of them, were agents, servants, employees and joint venturers of their Co-Defendants, and were, as such, acting within the course, scope and authority of said agency, employment and joint venture, and that each and every Defendant, as aforesaid, when acting as a principal, was negligent in the selection and hiring of each and every Defendant as an agent, employee, contractor, subcontractor and joint venturer, and that each Defendant, by and through its officers, directors or managing agents, authorized, ratified or otherwise approved the acts of the remaining Defendants, and that said officers, directors or managing agents participated in said acts with the Defendants, including DOES 1 through 100, inclusive, and each of them.

## SPECIFIC ALLEGATIONS

48. Plaintiff realleges as though fully set forth at length and incorporated herein by reference all of the allegations and statements contained hereinabove.

49. Plaintiff is informed and believes and thereon alleges that the Subject Vehicle was defective at the time of its manufacture, design, development, production, assembly, building, testing, inspection, installation, equipping, endorsement, exportation, importation, wholesaling, retailing, selling, renting, leasing, modification, and repair and entrustment, and that it failed to meet the reasonable

expectations of safety of the class of persons of which Plaintiff was a member, and that any benefits derived from the design of said vehicle were substantially outweighed by the risk of harm inherent in said design, in that, and not by way of limitation, despite the availability to Defendants of safer alternative designs, said vehicle presented a substantial and unreasonable risk of death or injury to the users of said vehicle or those in the vicinity of its use.

50. Specifically, Plaintiff is informed and believes and thereon alleges that said vehicle was defective in its design, construction, assembly and manufacture and dangerous to life and limb of the users and occupants thereof, in that, among other things and not by way of limitation, said vehicle was promoted as being safer than other vehicles on the market because of its autopilot and emergency braking systems, when in fact the car was demonstrably less safe than other vehicles, including those with similar features; the vehicle lacked common safeguards for the use of autopilot features, such as cameras that perform vision tracking of the driver to confirm the driver is looking at the road, automatic disabling if the driver becomes inattentive, or if the autopilot system fails to work in any manner; the vehicle lacked redundant systems which would serve as back-up if any system failed or became erratic; the vehicle lacked sufficient warnings and/or warning systems to alert the driver to the dangers inherent in the car's autopilot and/or emergency braking systems. Further, Tesla failed to use state-of-the-art technologies as part of their ACC and AEB systems to create greater redundancies in case one or more of the systems failed. Other automated driving systems have included these redundant features for several years. The aforementioned defects created substantial dangers which were unknown to Plaintiff Derrick Monet and the public in general, and would not be recognized by the ordinary user, and said Defendants failed to give adequate warning of such dangers.

51. Based on Tesla's advertising, promotional materials, statements by its officers, including Elon Musk, and the owner's manual, Plaintiff believed that the Model 3's technology – including

Autopilot's design, programming, software, hardware, and systems – would eliminate the risk of harm or injury to the vehicle operator by avoiding other vehicles or obstacles while driving on the roadways. Plaintiff further reasonably believed that the Model 3 was safer than a human operated vehicle because of Tesla's claimed technical superiority regarding the Model 3's Autopilot system and its driver assistance features, and because of Tesla's claim that all of the self-driving components engineered into the vehicle would prevent injury from driving into a fixed object of any kind.

52. The defects in the design, manufacture, configuration, and assembly of the subject vehicle were a substantial factor in causing Derrick Monet's injuries and Jenna Monet's injuries and death.

53. Prior to the sale and distribution of said vehicle, Defendants Tesla and DOES 1 through 100, inclusive, knew the vehicle was in a defective condition as previously described. Further, said Defendants, through their officers, directors and managing agents, had prior notice and knowledge from several sources, including but not limited to the results of a multiplicity of crash tests run prior to the date of said accident, internal memoranda and correspondence, and industry publications, as well as notice of numerous crashes and serious injuries caused by the design of the subject vehicle, that the vehicle was defective and presented a substantial and unreasonable risk of harm to the American motoring public, including Derrick Monet and decedent Jenna Monet, in that said defects unreasonably subjected occupants to injury as a result of failure in the event of foreseeable motor vehicle use.

54. Despite such knowledge, Defendants Tesla and DOES 1 through 100, inclusive, acting through their officers, directors and managing agents, for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in said vehicle and failed to warn the public, including Plaintiff and the decedent Jenna Monet, of the extreme risk of injury occasioned by said defects. Said Defendants and individuals intentionally proceeded with the design, manufacture, sale, distribution and marketing of said vehicle, knowing persons would be exposed to serious potential danger

in order to advance their own pecuniary interest. Defendants' conduct was despicable, and so contemptible that it would be looked down upon and despised by ordinary decent people and was carried on by Defendants with a willful and conscious disregard for the safety of Plaintiff and others.

55. As a result of the subject incident and the negligent and wrongful conduct of Defendants Tesla and DOES 1 through 100, inclusive, Plaintiff Derrick Monet proximately sustained serious personal injuries, and Plaintiff's wife Jenna Monet sustained injuries resulting in her death.

56. As a further proximate result of the conduct of said Defendants, Plaintiff incurred:

a. property and other pecuniary losses;

b. both past and future economic damages; and

c. general damages in an amount according to proof at trial.

**FIRST CAUSE OF ACTION BY PLAINTIFF FOR STRICT PRODUCT LIABILITY AGAINST DEFENDANT TESLA, INC.; AND DOES 1 THROUGH 100, INCLUSIVE**

57. Plaintiff realleges as though fully set forth at length and incorporated herein by reference all of the allegations and statements contained hereinabove.

58. Plaintiff is informed and believes and thereon alleges that at all times herein mentioned, Defendants Tesla and DOES 1 through 100, inclusive, and each of them, were the manufacturers, designers, developers, processors, producers, assemblers, builders, testers, inspectors, installers, equippers, endorsers, exporters, wholesalers, retailers, lessors, renters, sellers, lessors, modifiers, repairers, providers and otherwise distributors of the subject vehicle.

59. Plaintiff is informed and believes and thereon alleges that the subject vehicle, as previously described, was defective at the time of its manufacture, design, development, production, assembly, building, testing, inspection, installation, equipping, endorsement, exportation, importation, wholesaling, retailing, selling, renting, leasing, modification, repair and entrustment, and that it failed to meet the reasonable expectations of safety of the class of persons of which Plaintiff was a member as purchaser,

lessee and/or operator of a the subject vehicle, and that any benefits derived from the design of said vehicle were substantially outweighed by the risk of harm inherent in said design, in that, and not by way of limitation, despite the availability to Defendants of safer alternative designs, said vehicle presented a substantial and unreasonable risk of injury to the users of said vehicle or those in the vicinity of its use.

60. Specifically, Plaintiff is informed and believes that said vehicle was defective in its design, construction, assembly, and manufacture and dangerous to life and limb of the users and occupants thereof, in that, among other things and not by way of limitation, said vehicle's autonomous driving functions failed and were not designed to sufficiently protect the occupant in reasonably foreseeable conditions, such as this one. Tesla knew or should have known that its autonomous driving features lacked sufficient ability to detect emergency and or first responder vehicles that might be parked in or near the roadway. Further, said vehicle lacked sufficient safeguards to warn the driver that autonomous features might fail unexpectedly. Despite knowing drivers tend to pay less attention when driving a vehicle while using autonomous features, Defendants failed to provide adequate monitoring of the driver's attention and warning features that would adequately alert the driver of the need to stay attentive and focused on driving. The aforementioned defects created a substantial danger which was unknown to Plaintiff and the public in general, and would not be recognized by the ordinary user, and said Defendants failed to give adequate warning of such danger.

61. The foregoing defects in the design, manufacture, configuration and assembly of the subject vehicle were a substantial factor in causing severe personal injuries to Plaintiff Derrick Monet and his wife Jenna Monet, which proximately resulted in their severe personal injuries, and Jenna's death and damages alleged herein.

62. As a further direct and proximate result of the acts and omissions of Defendants, and each of them, as set forth herein, Plaintiff has suffered permanent and irreparable damage to his future earning

capacity and loss of future income as a proximate result of the acts and omissions of the Defendants, and each of them as set forth herein.

63. As a further direct and proximate result of the acts and omissions of the Defendants, and each of them as set forth herein, Plaintiff has lost the use of and interest on the money owed from the Defendants, and each of them, from the date of the acts complained of herein, to judgment as follows:

a. On the past and future medical expenses incurred to judgment.

b. On the loss of future earnings and earning capacity to judgment.

c. On other past and future special damages incurred to judgment.

d. On the general damages for pain and suffering to judgment.

## SECOND CAUSE OF ACTION BY PLAINTIFF, FOR NEGLIGENCE AGAINST DEFENDANTS TESLA, INC. AND DOES 1 THROUGH 100, INCLUSIVE

64. Plaintiff realleges as though fully set forth at length and incorporated herein by reference all of the allegations and statements contained hereinabove.

65. At all times herein mentioned, Defendants Tesla, Inc. and DOES 1 through 100, inclusive, and each of them, had a duty not to unreasonably manufacture, develop, design, process, produce, assemble, build, test, inspect, install, equip, endorse, export, import, wholesale, retail, sell, lease, rent, modify, provide warnings, repair or entrust said vehicle. Said Defendants, and each of them, breached their duty to Plaintiff, thereby proximately causing the injuries and damages as herein described. More specifically, Defendants Tesla and DOES 1 through 100, inclusive, and each of them, acted unreasonably in designing, manufacturing and marketing products which presented a substantial and unreasonable risk of injury to vehicle occupants, including Plaintiff Derrick Monet and his wife Jenna Monet.

66. Defendants Tesla, Inc. and DOES 1 through 100, inclusive, and each of them, breached their duty to Plaintiff, thereby causing the injuries and damages as hereinafter described, in the following ways:

a. The subject vehicle lacked a properly designed system for crash avoidance, which meant that the vehicle could and would collide with ordinary and foreseeable roadway features – including emergency vehicles – while operating in Autopilot;

b. The subject vehicle lacked a properly designed system for crash avoidance, such that Autopilot in fact guided the vehicle into an obstacle – rather than avoid an obstacle – when the subject vehicle collided with the emergency vehicle;

c. Autopilot's forward-looking camera, and the radar and ultrasonic sensors failed, such that Autopilot failed to detect the emergency vehicle;

d. Autopilot failed to make driving "safer and less stressful;"

e. Defendants failed to adequately test the Autopilot feature to prevent collision events like the subject incident.

f. The subject vehicle lacked sufficient safeguards to warn the driver that autonomous features might fail unexpectedly.

g. The subject vehicle lacked sufficient safeguards to warn the driver that autonomous features had failed unexpectedly.

h. Despite knowing drivers tend to pay less attention when driving a vehicle while using autonomous features, Defendants failed to provide adequate monitoring of the driver's attention and warning features that would adequately alert the driver of the need to stay attentive and focused on driving.

i. The subject vehicle failed to contain adequate warnings to users and their passengers of the defective and unreasonably dangerous condition of the vehicle – specifically, that Autopilot could suddenly fail without adequate warning; and

j. The subject vehicle was otherwise defective in ways that will be demonstrated by evidence obtained during discovery.

67. More specifically, Defendants Tesla and DOES 1 through 100, inclusive, and each of them, acted unreasonable risk in designing, manufacturing and marketing products which presented a substantial and unreasonable risk of injury to Plaintiff.

68. The negligence of said Defendants, and each of them, was a substantial factor in proximately causing the injuries and damages herein alleged.

69. Plaintiff has been severely hurt and injured in his health, strength, and activities, having sustained bodily injuries. All of said injuries have caused and continue to cause Plaintiff mental, physical, nervousness, pain, and suffering. Said injuries have and may result in permanent disability, all to Plaintiff's general damage, in such sums as will be proven at time of trial.

70. As a further direct and proximate result of said conditions and the conduct of said Defendants, Plaintiff was required to, did, and will in the future, employ physicians and surgeons to examine, treat and care for Plaintiff, employ specially trained persons to supply care and service and did and will in the future, incur medical and incidental expenses for such care and services.

71. As a further direct and proximate result of the acts and omissions of Defendants, and each of them, as set forth herein, Plaintiff has suffered permanent and irreparable damage to his future earning capacity and loss of future income of the acts and omissions of the Defendants, and each of them as set forth herein.

72. As a further direct and proximate result of the acts and omissions of the Defendants, and each of them as set forth herein, Plaintiff has lost the use of and interest on the money owed from the Defendants, and each of them, from the date of the acts complained of herein, to judgment as follows:

a. On the past and future medical expenses incurred to judgment.

b. On the loss of future earnings and earning capacity to judgment.

c. On other past and future special damages incurred to judgment.

d. On the general damages for pain and suffering to judgment.

**THIRD CAUSE OF ACTION BY PLAINTIFF, FOR BREACH OF WARRANTY AGAINST DEFENDANTS TESLA, INC. AND DOES 1 THROUGH 100, INCLUSIVE**

73. Plaintiff realleges as though fully set forth at length and incorporated herein by reference all of the allegations and statements contained hereinabove.

74. At all times herein mentioned, Defendants Tesla, Inc. and DOES 1 through 100, inclusive, designed, developed, processed, repaired, inspected, represented, tested, distributed, sold, consigned, delivered, maintained and operated for purpose of sale and distribution, said vehicle for use by the general public.

75. Plaintiff is informed and believes, and based upon such information and belief alleges, that at the time and place of said sale, delivery, distribution, repair, consignment, maintenance, or operation of said vehicle, said Defendants expressly and impliedly warranted to each buyer and user and to all persons reasonably expected to be in the immediate vicinity of said vehicle during use in any manner, that said vehicle was reasonably fit and safe for its intended purposes, and that said vehicle was accordingly of merchantable quality throughout.

76. At the time and place of said sale, delivery, distribution or supply, said vehicle was not reasonably fit and safe for its intended use by buyers, users or persons reasonably anticipated to be in the vicinity of the use of said products, including Plaintiff, and were therefore not of merchantable quality and constituted extreme danger and hazard to persons using or in the vicinity of said products.

77. As a result of said breaches of warranty, both express and implied, Plaintiff and Decedent Jenna Monet suffered severe personal injuries, including those resulting in Jenna Monet's death.

78. Plaintiff has been severely hurt and injured in his health, strength, and activities, having sustained bodily injuries. All of said injuries have caused and continue to cause Plaintiff mental, physical, nervousness, pain, and suffering. Said injuries have and may result in permanent disability, all to Plaintiff's general damage, in such sums as will be proven at time of trial.

79. As a further direct and proximate result of said conditions and the conduct of said Defendants, Plaintiff was required to, did, and will in the future, employ physicians and surgeons to examine, treat and care for Plaintiff, employ specially trained persons to supply care and service and did and will in the future, incur medical and incidental expenses for such care and services.

80. As a further direct and proximate result of the acts and omissions of Defendants, and each of them, as set forth herein, Plaintiff has suffered permanent and irreparable damage to his future earning capacity and loss of future income of the acts and omissions of the Defendants, and each of them as set forth herein.

81. As a further direct and proximate result of the acts and omissions of the Defendants, and each of them as set forth herein, Plaintiff has lost the use of and interest on the money owed from the Defendants, and each of them, from the date of the acts complained of herein, to judgment as follows:

a. On the past and future medical expenses incurred to judgment.

b. On the loss of future earnings and earning capacity to judgment.

c. On other past and future special damages incurred to judgment.

d. On the general damages for pain and suffering to judgment.

**FOURTH CAUSE OF ACTION FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY, CAL. COM. CODE §2314**
**(AGAINST DEFENDANTS TESLA, INC. F/K/A TESLA MOTORS, INC.; AND DOES 1 THROUGH 100, INCLUSIVE)**

82. Plaintiff re-alleges as though fully set forth at length and incorporates herein by reference all of the allegations and statements contained hereinabove forth herein.

83. Tesla was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Subject Vehicle. Tesla knew or had reason to know of the specific use for which the Subject Vehicle was purchased.

84. Defendants provided Plaintiff with an implied warranty that the Subject Vehicle, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. However, the

Subject Vehicle is not fit for its ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because, inter alia, there are defects in the vehicle control system, including:

a. Failure to properly design a system for crash avoidance, such that the Subject Vehicle could and did strike and collide with ordinary and foreseeable roadway features – including an emergency vehicle – while operating in Autopilot;

b. Autopilot's failure to perform obstacle avoidance, such that Autopilot in fact guides the Subject Vehicle to collide with an obstacle, such as the emergency vehicle in this case;

c. Autopilot's failed reliance on the forward-looking camera, and the failure of the radar and ultrasonic sensors, such that Autopilot failed to detect the emergency vehicle;

d. Autopilot's failure to make driving "safer and less stressful;"

e. Failure to adequately test the Autopilot feature to prevent collision events like the Subject Incident; and

f. Other defects that will be demonstrated by evidence obtained during discovery.

85. Therefore, the Subject Vehicle is not fit for its particular purpose of providing safe and reliable transportation.

86. Defendants impliedly warranted that the Subject Vehicle was of merchantable quality and fit for such use. This implied warranty included, among other things: (a) a warranty that the vehicles Tesla manufactured, supplied, distributed, and/or sold were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (b) a warranty that the Subject Vehicle would be fit for its intended use while being operated.

87. Contrary to the applicable implied warranties, the Subject Vehicle at the time of sale and thereafter was not fit for its ordinary and intended purpose of providing Plaintiff with reliable, durable, and safe transportation. Instead, the Subject Vehicle suffers from a defective design(s) and/or manufacturing defect(s).

88. Defendants' actions, as complained of herein, breached the implied warranty that the Subject Vehicle was of merchantable quality and fit for such use.

89. After Plaintiff received the injuries complained of herein, notice was given by Plaintiff to Defendants, by direct communication with Defendant Tesla as well as by the filing of this lawsuit in the time and manner and in the form prescribed by law, of the breach of said implied warranty.

90. As a legal and proximate result of the breach of said implied warranty, Plaintiff sustained the damages herein set forth.

91. Plaintiff is, therefore, entitled to damages in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION FOR BREACH OF EXPRESS WARRANTY, CAL. COM. CODE §2313 (AGAINST DEFENDANTS TESLA, INC. F/K/A TESLA MOTORS, INC.; AND DOES 1 THROUGH 100, INCLUSIVE)**

92. Plaintiff re-alleges as though fully set forth at length and incorporates herein by reference all of the allegations and statements contained hereinabove forth herein.

93. Defendants provided Plaintiff, as owner of the Subject Vehicle, with the express warranties described herein, which became part of the basis of the parties' bargain. Accordingly, Tesla's warranties are express warranties under state law.

94. In the course of selling and leasing its vehicles, Defendants expressly warranted in writing that its vehicles were covered by a New Vehicle Limited Warranty (or "Basic Vehicle Limited Warranty") that provided: "the Basic Vehicle Limited warranty covers the repair or replacement necessary to correct defects in the materials or workmanship of any parts manufactured or supplied by Tesla that occur under normal use for a period of 4 years or 50,000 miles (80,000 km), whichever comes first."

95. Defendants distributed the defective parts causing the defects in the Subject Vehicle, and said parts are covered by Defendants' warranties granted to Plaintiff as owner of the Subject Vehicle.

96. Defendants breached these warranties by selling the Subject Vehicle with the defects, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

97. Plaintiff notified Defendants of the breach within a reasonable time, and/or was not required to do so because affording Defendants a reasonable opportunity to cure its breaches would have been futile. Defendants also knew about the defects but chose instead to conceal them as a means of avoiding compliance with its warranty obligations.

98. As a direct and proximate cause of Defendants' breach, Plaintiff bought the Subject Vehicle that he otherwise would not have, overpaid for his vehicle, did not receive the benefit of the bargain, and his Subject Vehicle suffered a diminution in value. Plaintiff has incurred and will continue to incur costs related to the defects' diagnosis and repair.

99. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and inadequate to protect Plaintiff. Among other things, Plaintiff had no meaningful choice in determining the time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and Plaintiff because Defendants knew or should have known that the Subject Vehicle was defective at the time of sale and would fail well before its useful life.

100. Plaintiff has complied with all obligations under the warranty, or otherwise has been excused from performance of said obligations as a result of Defendants' conduct.

**SIXTH CAUSE OF ACTION FOR INTENTIONAL MISREPRESENTATION (AGAINST DEFENDANT TESLA, INC. F/K/A TESLA MOTORS, INC.; AND DOES 1 THROUGH 100, INCLUSIVE)**

101. Plaintiff realleges as though fully set forth at length and incorporates herein by reference all the allegations and statements contained hereinabove.

102. At all times Plaintiff and Defendants entered into the aforementioned agreements, Defendant Tesla and DOES 1 through 100 had no intention of complying with its obligations under said agreements, including but not limited to: Defendants' representations that the Subject Vehicle was the safest vehicle on the road, and that the Subject Vehicle conformed to reasonable consumer expectations. Defendants failed to abide by their warranties, and Defendants failed to implement functioning reasonable safety features so as to ensure the Subject Vehicle would not engage the type of collision as occurred in the Subject Incident.

103. At the time the Defendant Tesla and DOES 1 through 100, by and through its authorized agents, made the aforementioned promises and representations, said Defendants did not intend to perform said promises or to perform as represented but rather made said promises and representations with the intent to induce Plaintiff to purchase the Subject Vehicle. Had Plaintiff known that Defendants Tesla and

DOES 1 through 100 did not intend to comply with the representations described herein, he would not have purchased the subject vehicle, placing his and his family's lives at risk.

104. Plaintiff reasonably relied upon the aforementioned promises and representations of Defendants Tesla and DOES 1 through 100 in purchasing the Subject Vehicle despite said vehicle not conforming to reasonable consumer expectations, including, but not limited to safety, secure operations, control, free of defects, and not a risk to life and limb. Plaintiff had no reason to suspect then that the promises and representations were false.

105. As a result of making the aforementioned false promises and representations, and in wrongfully inducing Plaintiff's reliance thereupon, Defendants Tesla and DOES 1 through 100 and its authorized agents and employees, are liable to Plaintiff for the aforementioned fraudulent misrepresentations and all damages proximately resulting therefrom.

106. As a direct and proximate result of the Defendants' fraud in inducing Plaintiff to purchase the Subject Vehicle, a non-conforming and defective vehicle, Plaintiff has incurred special damages in a sum, which will be shown at trial according to proof.

107. In performing the intentionally tortious fraudulent conduct described herein, Defendants Tesla and DOES 1 through 100 acted with oppression, fraud, malice and in conscious disregard of Plaintiff's rights.

**SEVENTH CAUSE OF ACTION FOR COMMON LAW FRAUDULENT CONCEALMENT (AGAINST DEFENDANT TESLA, INC. F/K/A TESLA MOTORS, INC.; AND DOES 1 THROUGH 100, INCLUSIVE)**

108. Plaintiff realleges as though fully set forth at length and incorporates herein by reference all the allegations and statements contained hereinabove.

109. Defendants were aware of the inadequacies and defects with the vehicle Autopilot by receiving notice of prior similar failures in vehicles on the road, permitting a collision with an object while the Autopilot was engaged, leading to injuries and deaths. Such events include, but are not limited to, those listed previously.

110. Defendants made material omissions concerning a presently existing or past fact. Specifically, Defendants did not fully and truthfully disclose to its customers, including Plaintiff, the true

nature of the inherent defects of the Subject Vehicle, as described herein. Said defects were not readily discoverable until years later – in Plaintiff's case, when the Subject Incident occurred.

111. As a result, Plaintiff was fraudulently induced to purchase the Subject Vehicle with the said defects and all of the associated problems.

112. Defendants made these representations with knowledge of their falsity, and with the intent that Plaintiff rely on them.

113. Plaintiff reasonably relied on these omissions and suffered damages as a result.

**EIGHTH CAUSE OF ACTION**
**BY PLAINTIFF DERRICK MONET, AGAINST DEFENDANTS**
**TESLA, INC. AND DOES 1 THROUGH 100, INCLUSIVE**
**FOR LOSS OF CONSORTIUM**

114. Plaintiff realleges as though fully set forth at length and incorporated herein by reference all of the allegations and statements contained hereinabove.

115. At all times herein mentioned, Plaintiff Derrick Monet and decedent Jenna Monet were at the time of the crash that took Jenna's life, lawfully married and residing together as husband and wife.

116. Plaintiff Derrick Monet has suffered loss of consortium with his wife Jenna Monet as a result of injuries to her, including the loss of love, care, companionship, comfort, services, marital relations, society, solace, affection, instruction, advice, training, guidance, protection, counsel, support, and comfort, attention, and guidance, society, sexual relations, the moral support a spouse gives the other through the triumph and despair of life, and the deprivation of her physical assistance in operating and maintaining the family home, all to his damage in an amount according to proof.

**NINTH CAUSE OF ACTION**
**BY PLAINTIFF DERRICK MONET AS PERSONAL REPRESENTATIVE**
**OF THE ESTATE OF JENNA MONET, DECEASED**

117. Plaintiff realleges as though fully set forth at length and incorporated herein by reference all of the allegations and statements contained hereinabove.

118. Derrick Monet is the Personal Representative to the Estate of Jenna Monet, deceased.

119. As a result of the defective and unreasonably dangerous condition of the defects in the design, manufacture, configuration and assembly of the subject vehicle and the negligence of the Defendants, Jenna Monet suffered severe conscious pain and suffering from moments after the impact until the time of her death, resulting in damages compensable to his Estate in an amount according to proof.

## DAMAGES

120. Plaintiff Derrick Monet sustained serious, permanent injuries in this crash, which included nine fractures, including a lumbar, thoracic and cervical vertebrae, scapula, two ribs, and a right femur, which now has a rod implanted. Derrick is now on terminal leave from the Air Force and will be discharged October 3rd, 2021. He has suffered economic and non-economic loss.

121. Jenna Monet died in the crash. Plaintiff Derrick Monet suffers emotionally and financially from her loss.

122. Plaintiff has been severely hurt and injured in his health, strength, and activities, having sustained bodily injuries. All of said injuries have caused and continue to cause Plaintiff mental, physical, nervousness, pain, and suffering. Said injuries have and may result in permanent disability, all to Plaintiff's general damage, in such sums as will be proven at time of trial.

123. As a further direct and proximate result of said conditions and the conduct of said Defendants, Plaintiff was required to, did, and will in the future, employ physicians and surgeons to examine, treat and care for Plaintiff, employ specially trained persons to supply care and service and did and will in the future, incur medical and incidental expenses for such care and services.

124. As a further direct and proximate result of the acts and omissions of Defendants, and each of them, as set forth herein, Plaintiff has suffered permanent and irreparable damage to his future earning capacity and loss of future income.

125. As a further direct and proximate result of the acts and omissions of the Defendants, and each of them as set forth herein, Plaintiff has lost the use of and interest on the money owed from the Defendants, and each of them, from the date of the acts complained of herein, to judgment as follows:

a. On the past and future medical expenses incurred to judgment.

b. On the loss of future earnings and earning capacity to judgment.

c. On other past and future special damages incurred to judgment.

d. On the general damages for pain and suffering to judgment.

**PRAYER**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

126. General and Special damages in an amount in excess of the minimum jurisdictional limits of the Superior Court and according to proof including:

a. Economic loss, past and future, including but not limited to: lost earnings, lost profits, medical expenses, lost earning capacity, and loss of household services.

b. Noneconomic loss, past and future, including but not limited to: physical pain, mental suffering, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation, loss of consortium, and emotional distress.

c. Prejudgment interest according to proof;

d. Costs of suit;

e. Such other and further relief as the Court deems proper.

Date: November 17, 2021

ELISE R. SANGUINETTI, SBN 191389
JAMIE G. GOLDSTEIN, SBN 302479
ARIAS SANGUINETTI WANG & TORRIJOS, LLP
2200 Powell Street, Suite 740
Emeryville, CA 94608
Telephone: (510) 629-4877
Facsimile: (510) 291-9742
Attorneys for Plaintiff
elise@aswtlawyers.com

NICOLE L. JUDGE (JU005)
SLAVIK LAW FIRM, LLC
3001 South Lincoln Avenue
Suite C-1
Steamboat Springs, CO 80487
Telephone: (970) 457-1011
Facsimile: (267)-878-7697
Attorneys for Plaintiff
Pro Hac Vice Pending
njudge@slavik.us

BY: Elise R Sanguinetti
Elise Sanguinetti
Attorneys for Plaintiffs

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Date: November 17, 2021

ELISE R. SANGUINETTI, SBN 191389
JAMIE G. GOLDSTEIN, SBN 302479
ARIAS SANGUINETTI WANG & TORRIJOS, LLP
2200 Powell Street, Suite 740
Emeryville, CA 94608
Telephone: (510) 629-4877
Facsimile: (510) 291-9742
Attorneys for Plaintiff
elise@aswtlawyers.com

NICOLE L. JUDGE (JU005)
SLAVIK LAW FIRM, LLC
3001 South Lincoln Avenue
Suite C-1
Steamboat Springs, CO 80487
Telephone: (970) 457-1011
Facsimile: (267)-878-7697
Attorneys for Plaintiff
Pro Hac Vice Pending
njudge@slavik.us

BY: Elise R Sanguinetti
Elise Sanguinetti
Attorneys for Plaintiffs

U.S. Department of Transportation

**National Highway Traffic Safety Administration**

# ODI RESUME

**Investigation:** PE 21-020
**Date Opened:** 08/13/2021
**Investigator:** Steven Posada **Reviewer:** Gregory Magno
**Approver:** Stephen Ridella
**Subject:** Autopilot & First Responder Scenes

## MANUFACTURER & PRODUCT INFORMATION

**Manufacturer:** Tesla, Inc.
**Products:** 2014-2021 Tesla Model Y, Model X, Model S, Model 3
**Population:** 765,000 (Estimated)

**Problem Description:** Subject vehicle crashes with in-road or roadside first responders.

## FAILURE REPORT SUMMARY

| | ODI | Manufacturer | Total |
|---|---|---|---|
| **Complaints:** | 0 | TBD | 0 |
| **Crashes/Fires:** | 11 | TBD | 11 |
| **Injury Incidents:** | 7 | TBD | 7 |
| **Number of Injuries:** | 17 | TBD | 17 |
| **Fatality Incidents:** | 1 | TBD | 1 |
| **Number of Fatalities:** | 1 | TBD | 1 |

## ACTION / SUMMARY INFORMATION

**Action:** ODI has opened a Preliminary Evaluation

**Summary:**

Since January 2018, the Office of Defects Investigation (ODI) has identified eleven crashes in which Tesla models of various configurations have encountered first responder scenes and subsequently struck one or more vehicles involved with those scenes. The incidents are listed at the end of this summary by date, city, and state.

Most incidents took place after dark and the crash scenes encountered included scene control measures such as first responder vehicle lights, flares, an illuminated arrow board, and road cones. The involved subject vehicles were all confirmed to have been engaged in either Autopilot or Traffic Aware Cruise Control during the approach to the crashes.

Autopilot is an Advanced Driver Assistance System (ADAS) in which the vehicle maintains its speed and lane centering when engaged within its Operational Design Domain (ODD). With the ADAS active, the driver still holds primary responsibility for Object and Event Detection and Response (OEDR), e.g., identification of obstacles in the roadway or adverse maneuvers by neighboring vehicles during the Dynamic Driving Task (DDT).

ODI has opened a Preliminary Evaluation of the SAE Level 2 ADAS system (Autopilot) in the Model Year 2014-2021 Models Y, X, S,and 3. The investigation will assess the technologies and methods used to monitor, assist, and enforce the driver's engagement with the dynamic driving task during Autopilot operation. The investigation will additionally assess the OEDR by vehicles when engaged in Autopilot mode, and ODD in which the Autopilot mode is functional. The investigation will also include examination of the contributing circumstances for the confirmed crashes listed below and other similar crashes.

Incident List

# EXHIBIT 1

| Date | City/County | State |
|---|---|---|
| 07/10/2021 | San Diego | CA |
| 05/19/2021 | Miami | FL |
| 03/17/2021 | Lansing | MI |
| 02/27/2021 | Montgomery County | TX |
| 08/26/2020 | Charlotte | NC |
| 07/30/2020 | Cochise County | AZ |
| 01/22/2020 | West Bridgewater | MA |
| 12/29/2019 | Cloverdale | IN |
| 12/10/2019 | Norwalk | CT |
| 05/29/2018 | Laguna Beach | CA |
| 01/22/2018 | Culver City | CA |

# EXHIBIT 2

United States Senate
WASHINGTON, DC 20510

August 18, 2021

The Honorable Lina Khan
Chair
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580

Dear Chair Khan,

We write to express our serious concerns about Tesla's misleading advertising of its Autopilot and Full Self-Driving (FSD) features. Tesla's marketing has repeatedly overstated the capabilities of its vehicles, and these statements increasingly pose a threat to motorists and other users of the road. Accordingly, we urge you to open an investigation into potentially deceptive and unfair practices in Tesla's advertising and marketing of its driving automation systems and take appropriate enforcement action to ensure the safety of all drivers on the road.

On August 13, 2021, the National Highway Traffic Safety Administration (NHTSA) opened a formal investigation into Tesla's Autopilot feature after identifying 11 crashes with Autopilot engaged since 2018 that involved a Tesla striking one or more vehicles at first responder sites.[1] This is not the first time NHTSA has investigated Tesla's Autopilot. While a previous investigation, closed in 2017, did not identify any defects with Autopilot after a fatal crash, this latest investigation is a new defect investigation into Tesla's Autopilot.[2]

Tesla's Autopilot and FSD are partially automated and include lane keeping assistance and adaptive cruise control features that can help prevent driver stress and fatigue when properly used. They are not fully autonomous features, however, and there are no fully autonomous vehicles currently available on the market. In fact, NHTSA estimates that fully automated safety features and true highway autopilot will not be ready until at least 2025.[3] Understanding these limitations is essential, for when drivers' expectations exceed their vehicle's capabilities, serious and fatal accidents can and do result.

We fear that Tesla's Autopilot and FSD features are not as mature and reliable as the company pitches to the public. On April 22, 2019, Tesla posted a video on its YouTube channel titled "Full Self-Driving" showing a Tesla driving entirely on its own.[4] Tesla CEO Elon Musk has also repeatedly boasted about Tesla's systems. In July 2020 and again in January 2021, Mr. Musk claimed

---

[1] U.S. Department of Transportation, National Highway Traffic Safety Administration, "ODI Resume: Autopilot & First Responder Scenes," https://static.nhtsa.gov/odi/inv/2021/INOA-PE21020-1893.pdf (accessed August 16, 2021).
[2] U.S. Department of Transportation, National Highway Traffic Safety Administration, "ODI Resume: Automatic vehicle control systems," https://static.nhtsa.gov/odi/inv/2016/INCLA-PE16007-7876.pdf (accessed August 16, 2021).
[3] National Highway Traffic Safety Administration, "Automated Vehicles for Safety," https://www.nhtsa.gov/technology-innovation/automated-vehicles-safety (accessed August 9, 2021).
[4] Tesla, "Full Self-Driving," YouTube video, 1:56, April 22, 2019, https://youtu.be/tlThdr3O5Qo.

to consumers that Tesla vehicles would soon reach Level 5 autonomy, or full automation.[5] Unfortunately, Tesla's advertising and marketing is reaching a large audience: the "Full Self-Driving" video has been viewed more than 18 million times. While Tesla has buried qualifying disclaimers elsewhere on their website, the link in the video's caption redirects to a purchasing page that fails to provide additional information about the true capabilities of the vehicle.[6]

Tesla drivers listen to these claims and believe their vehicles are equipped to drive themselves – with potentially deadly consequences. At least 11 people have died in fatal crashes with Autopilot activated since Tesla introduced the feature in 2015.[7] In May, the driver of a Tesla Model 3 was killed after the vehicle crashed on a highway in California. The driver had previously posted a video of his Tesla online in which it drove itself without human assistance. Autopilot was activated when the crash occurred.[8] Less than two weeks after the fatal crash, California Highway Patrol arrested a man for riding in the backseat of his Tesla while the vehicle was in Autopilot on the highway. After his arrest, the driver cited Mr. Musk's statements about the vehicle's abilities as justification for his actions.[9] It is clear that drivers take Tesla's statements about their vehicles' capabilities at face value and suffer grave consequences.

Advocates and other federal agencies have repeatedly called on the FTC to act on Tesla's possible false advertising of its driving automation systems. In 2018, the Center for Auto Safety and Consumer Watchdog wrote to then FTC Chairman Joseph Simons urging the FTC to investigate Tesla's deceptive and unfair practices in the advertising and marketing of Autopilot after two fatal crashes.[10] They renewed their request to the Commission in 2019 following additional fatal incidents.[11] NHTSA also sent Mr. Musk a cease-and-desist letter in 2018 over his claims about the vehicles' safety and, importantly, asked the FTC to investigate the claims under its "unfair or deceptive acts practices" authority.[12] As the FTC has noted in other matters, the Commission has a significant role in protecting consumers against false, misleading, and dangerous advertising in car sales.[13]

---

[5] "Elon Musk says full self-driving Tesla tech 'very close,'" *BBC* (London, England), July 9, 2020, https://www.bbc.com/news/technology-53349313; Kyle Hyatt, "Elon Musk says Tesla's Full Self-Driving tech will have Level 5 autonomy by the end of 2021," *Roadshow*, January 27, 2021, https://www.cnet.com/roadshow/news/elon-musk-full-self-driving-tesla-earnings-call/.

[6] *Tesla*, https://www.tesla.com/?utm_campaign=FSD&utm_source=youtube&utm_medium=social (accessed August 9, 2021).

[7] Rick Newman, "It's time to notice Tesla's Autopilot death toll," *Yahoo! Finance* (New York, New York), April 19, 2021, https://finance.yahoo.com/news/its-time-to-notice-teslas-autopilot-death-toll-195849408.html.

[8] Daisy Nguyen, "Tesla driver in fatal California crash had posted videos of himself in vehicle" *Los Angeles Times* (Los Angeles, California), May 16, 2021, https://www.latimes.com/california/story/2021-05-16/tesla-driver-in-fatal-california-crash-had-post-videos-of-himself-in-vehicle.

[9] Katherine Bindley and Rebecca Elliot, "Tesla Drivers Test Autopilot's Limits, Attracting Audiences–and Safety Concerns," *Wall Street Journal* (New York, New York), May 20, 2021, https://www.wsj.com/articles/tesla-drivers-test-autopilots-limits-attracting-audiencesand-safety-concerns-11621503008.

[10] Jason Levine and John Simpson to the Honorable Joseph Simons, May 23, 2018, https://www.autosafety.org/wp-content/uploads/2018/05/CAS-and-CW-Letter-to-FTC-on-Tesla-Deceptive-Advertising.pdf.

[11] Jason Levine and Adam Scow to the Honorable Joseph Simons, July 25, 2019, https://www.autosafety.org/wp-content/uploads/2019/07/CAS-and-CW-Letter-to-FTC-on-Tesla-Deceptive-Advertising-2019-FINAL.pdf.

[12] Sean O'Kane, "Feds told Tesla to stop 'mislead' the public about Model 3 safety," *The Verge* (Washington, D.C.) August 7, 2019, https://www.theverge.com/2019/8/7/20758349/tesla-model-3-safety-misleading-ftc-national-highway-traffic-administration-elon-musk.

[13] Federal Trade Commission, "Statement of the Federal Trade Commission Concerning Auto Recall Advertising Cases,"

Despite these warnings, Tesla has persistently misrepresented the capabilities of its cars and the company's progress towards safe Autopilot and FSD technology. On an earnings call in January this year, Mr. Musk claimed Tesla vehicles would be fully autonomous by the end of the year.[14] On July 9, 2021, Tesla released beta version 9 of what it brands to consumers as "Full Self-Driving" software, a subscription feature (recently made available to all Tesla owners) that costs hundreds of dollars per month but – despite its name – does not deliver full autonomy.[15] After the update, drivers have posted videos online showing their updated Tesla vehicles making unexpected maneuvers that require human intervention to prevent a crash.[16] Mr. Musk's tepid precautions tucked away on social media are no excuse for misleading drivers and endangering the lives of everyone on the road.[17] As Tesla makes widely available its FSD and Autopilot technology and doubles down on its inflated promises, we are alarmed by the prospect of more drivers relying more frequently on systems that do not nearly deliver the expected level of safety.

Tesla and Mr. Musk's repeated overstatements of their vehicle's capabilities – despite clear and frequent warnings – demonstrate a deeply concerning disregard for the safety of those on the road and require real accountability. Their claims put Tesla drivers – and all of the travelling public – at risk of serious injury or death. In light of these concerns, we urge you to swiftly open an investigation into Tesla's repeated and overstated claims about their Autopilot and Full Self-Driving features and take appropriate enforcement action to prevent further injury or death as a result of any Tesla feature.

Thank you for your attention to this important matter, and we look forward to your response.

Sincerely,

RICHARD BLUMENTHAL
United States Senate

EDWARD J. MARKEY
United States Senate

---

https://www.ftc.gov/system/files/documents/cases/161216_six_auto_recall_cases_statement_of_the_commission_1_1.pdf (accessed August 9, 2021).

[14] Hyatt, "Elon Musk." After inquiries from the California Department of Motor Vehicles, Tesla walked back Musk's comments about the Full-Self Driving feature, calling full autonomy "unlikely" by the end of 2021. Andrew Hawkins, "Tesla privately admits Elon Musk has been exaggerating about full self-driving," *The Verge* (Washington, D.C.), May 7, 2021 https://www.theverge.com/2021/5/7/22424592/tesla-elon-musk-autopilot-dmv-fsd-exaggeration.

[15] "Support," *Tesla*, https://www.tesla.com/support/full-self-driving-subscriptions (accessed August 9, 2021).

[16] AI Addict, "[FSD Beta 9] Downtown San Francisco," YouTube video, 11:12, July 11, 2021, https://youtu.be/GlIdu7prsAw. Full breadth of videos seen at ahttps://www.youtube.com/results?search_query=tesla+fsd+9.

[17] In advance of the release, Musk acknowledged that drivers must "be paranoid" as the software will have "unknown issues," and the release notes similarly tell drivers to use "additional caution" because the software "may do the wrong thing at the worst time." Elon Musk (@elonmusk), Twitter post, July 8, 2021, 9:18 p.m., https://twitter.com/elonmusk/status/1413306409693892613; Tesla Raj (@tesla_raj), Twitter post, July 10, 2021, 3:37 a.m., https://twitter.com/tesla_raj/status/1413764413165772803.

# EXHIBIT 3

U.S. Department of Transportation
**National Highway Traffic Safety Administration**

1200 New Jersey Avenue SE.
Washington, DC 20590

October 12, 2021

**SENT VIA E-MAIL**

Eddie Gates
Director, Field Quality
Tesla, Inc.
45500 Fremont Blvd.
Fremont, CA 94538

NEF-104
PE21-020

Dear Mr. Gates,

This letter follows up recent discussions between our organizations and requests additional information from Tesla with respect to two recent actions taken by your company. Tesla's late September 2021 distribution of functionality to certain Tesla vehicle models intended to improve detection of emergency vehicle lights in low light conditions, and Tesla's early October 2021 release of the Full Self-Driving Beta Request Menu option.

As Tesla is aware, the Safety Act imposes an obligation on manufacturers of motor vehicles and motor vehicle equipment to initiate a recall by notifying NHTSA when they determine vehicles or equipment they produced contain defects related to motor vehicle safety or do not comply with an applicable motor vehicle safety standard. *See* 49 U.S.C. § 30118. This recall notice must be filed with NHTSA no more than five working days after the manufacturer knew or should have known of the safety defect or noncompliance. *See* 49 C.F.R. § 573.6(b); *see also United States v. General Motors Corp.*, 656 F. Supp. 1555, 1559 n.5 (D.D.C. 1987). Any manufacturer issuing an over-the-air update that mitigates a defect that poses an unreasonable risk to motor vehicle safety is required to timely file an accompanying recall notice to NHTSA pursuant to 49 U.S.C. § 30118 and 49 C.F.R. Part 573.

Unless otherwise stated in the text, the following definitions apply to these information requests:

- **Subject System**: Suite of software, hardware, data, and any other related systems on or off the vehicle that contributes to the conferral of any Level 2 capabilities on any Tesla vehicle, including but not limited to the various "Autopilot" packages.

- **Subject Vehicles**: All Tesla vehicles, model years 2014 - 2021, equipped with the subject system at any time, and manufactured for sale or lease in the United States, including, but not limited to, the District of Columbia, and current U.S. territories and possessions.

- **<u>Emergency Light Detection Update</u>**: Updates distributed by Tesla beginning in September 2021 to certain Tesla vehicle models with the stated purpose of detecting flashing emergency vehicle lights in low light conditions and then responding to said detection with driver alerts and changes to the vehicle speed while Auto Pilot is engaged.

- **<u>FSD:</u>** means Tesla "Full Self-Driving," also referred to by Tesla as "Autosteer on City Streets."

- **<u>FSD Beta Request</u>**: In-vehicle menu update added by Tesla in October 2021 enabling owners to request consideration for future acceptance into Tesla's Full-Self Driving early access beta release including but not limited to: related in-vehicle menu options and Tesla's customer scoring and selection criteria.

- **<u>Tesla</u>**: Tesla, Inc. all of its past and present officers and employees, whether assigned to its principal offices or any of its field or other locations, including all of its divisions, subsidiaries (whether or not incorporated) and affiliated enterprises and all of their headquarters, regional, zone and other offices and their employees, and all agents, contractors, consultants, attorneys and law firms and other persons engaged directly or indirectly (e.g., employee of a consultant) by or under the control of Tesla (including all business units and persons previously referred to), who are or, in or after January 1st, 2011 were involved in any way with any of the following related to the alleged defect in the subject vehicles:
  a. Design, engineering, analysis, modification or production (e.g. quality control);
  b. Testing, assessment or evaluation;
  c. Consideration, or recognition of potential or actual defects, reporting, record-keeping and information management, (e.g., complaints, field reports, warranty information, part sales), analysis, claims, or lawsuits; or
  d. Communication to, from or intended for zone representatives, fleets, dealers, or other field locations, including but not limited to people who have the capacity to obtain information from dealers.

- **<u>Document</u>**: "Document(s)" is used in the broadest sense of the word and shall mean all original written, printed, typed, recorded, or graphic matter whatsoever, however produced or reproduced, of every kind, nature, and description, and all non-identical copies of both sides thereof, including, but not limited to, papers, letters, memoranda, correspondence, communications, electronic mail (e-mail) messages (existing in hard copy and/or in electronic storage), faxes, mailgrams, telegrams, cables, telex messages, notes, annotations, working papers, drafts, minutes, records, audio and video recordings, data, databases, other information bases, summaries, charts, tables, graphics, other visual displays, photographs, statements, interviews, opinions, reports, newspaper articles, studies, analyses, evaluations, interpretations, contracts, agreements, jottings, agendas, bulletins, notices, announcements, instructions, blueprints, drawings, as-builts, changes, manuals, publications, work schedules, journals, statistical data, desk, portable and computer calendars, appointment books, diaries, travel reports, lists, tabulations, computer printouts, data processing program libraries, data processing inputs and outputs, microfilms, microfiches, statements for services, resolutions, financial statements,

governmental records, business records, personnel records, work orders, pleadings, discovery in any form, affidavits, motions, responses to discovery, all transcripts, administrative filings and all mechanical, magnetic, photographic and electronic records or recordings of any kind, including any storage media associated with computers, including, but not limited to, information on hard drives, floppy disks, backup tapes, and zip drives, electronic communications, including but not limited to, the Internet and shall include any drafts or revisions pertaining to any of the foregoing, all other things similar to any of the foregoing, however denominated by Tesla, any other data compilations from which information can be obtained, translated if necessary, into a usable form and any other documents. For purposes of this request, any document which contains any note, comment, addition, deletion, insertion, annotation, or otherwise comprises a non-identical copy of another document shall be treated as a separate document subject to production. In all cases where original and any non-identical copies are not available, "document(s)" also means any identical copies of the original and all non-identical copies thereof. Any document, record, graph, chart, film or photograph originally produced in color must be provided in color. Furnish all documents whether verified by Tesla or not. If a document is not in the English language, provide both the original document and an English translation of the document.

- **Other Terms**: To the extent that they are used in these information requests, the terms "claim," "consumer complaint," "dealer field report," "field report," "fire," "fleet," "good will," "make," "model," "model year," "notice," "property damage," "property damage claim," "rollover," "type," "warranty," "warranty adjustment," and "warranty claim," whether used in singular or in plural form, have the same meaning as found in 49 CFR 579.4.

In order for my staff to evaluate the alleged defect, certain information is required. Pursuant to 49 U.S.C. § 30166, please provide numbered responses to the following information requests. Insofar as Tesla has previously provided a document to ODI, Tesla may produce it again or identify the document, the document submission to ODI in which it was included and the precise location in that submission where the document is located. When documents are produced, the documents shall be produced in an identified, organized manner that corresponds with the organization of this information request letter (including all individual requests and subparts). When documents are produced and the documents would not, standing alone, be self-explanatory, the production of documents shall be supplemented and accompanied by explanation.

Please repeat the applicable request verbatim above each response. After Tesla's response to each request, identify the source of the information and indicate the last date the information was gathered.

1. Furnish a chronology of events, internal investigations, and studies that led to Tesla's deployment of the Emergency Light Detection Update. Separately include:
   a. Dates, descriptions, and identifiers of all releases to the vehicle fleet whether operational or shadow mode; and

   b. Listing and description of field incidents or other events that motivated the release of the Emergency Light Detection Update.

2. List the Tesla vehicle model / model year and any other distinguishing characteristics that received the Emergency Light Detection Update. Separately describe:
   a. The basis applied to defining the scope of covered vehicles;
   b. Any measures to extend this capability more broadly throughout Tesla's fleet; and
   c. Reasoning for instances where a vehicle cannot accept the Emergency Light Detection Update or related functionality.

3. For each of the applicable incidents cited in PE21-020 Information Request sent to Tesla on August 31, 2021, furnish Tesla's assessment of any changes to incident timing or outcome had the Emergency Light Detection Update been operational in the affected vehicle at the time of collision. Include any supporting analyses.

4. State whether Tesla intends to file a safety recall pursuant to 49 U.S.C. § 30118 covering vehicles that received the Emergency Light Detection Update. If not, please furnish Tesla's technical and/or legal basis for declining to do so.

5. Provide a copy of any agreement between Tesla and the owner of a subject vehicle involving vehicle repairs, access to software, upgrades to software, refund of the purchase price of a vehicle or software, or providing the vehicle owner with any other compensation, valuable consideration, or goodwill involving the subject system, including to resolve a lawsuit, arbitration, or other claim.

6. Furnish Tesla's criteria and timeline for allowing access to customers who have requested consideration in Tesla's FSD Beta Request process. Include detailed descriptions of all selection criteria and copies of supporting documents.

7. Supply a listing of the number of respondents who have opted in on the FSD Beta Request and the effective date and time for that figure.

8. For each vehicle equipped with FSD please provide:
   a. The vehicle identification number;
   b. The date on which FSD was installed on the vehicle; and
   c. Whether the vehicle owner is an employee of Tesla.

**Legal Authority for This Request**

This letter is being sent to Tesla pursuant to 49 U.S.C. § 30166, which authorizes NHTSA to conduct any investigation that may be necessary to enforce Chapter 301 of Title 49 and to request reports and the production of things. It constitutes a new request for information.

**Civil Penalties**

Tesla's failure to respond promptly and fully to this letter could subject Tesla to civil penalties pursuant to 49 U.S.C. § 30165 or lead to an action for injunctive relief pursuant to 49 U.S.C. § 30163. (Other remedies and sanctions are available as well.) The Vehicle Safety Act, as amended, 49 U.S.C. § 30165(a)(3), provides for civil penalties of up to $22,992 per violation per day, with a maximum of $114,954,525 for a related series of daily violations, for failing or refusing to perform an act required under 49 U.S.C. § 30166. See 49 CFR 578.6 (as amended by Fixing America's Surface Transportation Act (the "FAST Act"), Pub. L. 114-94, § 24110(a)(2), 129 Stat. 1312 (Dec. 4, 2015)). This includes failing to respond completely, accurately, and in a timely manner to ODI information requests.

If Tesla cannot respond to any specific request or subpart(s) thereof, please state the reason why it is unable to do so. If on the basis of attorney client, attorney work product, or other privilege, Tesla does not submit one or more requested documents or items of information in response to this information request, Tesla must provide a privilege log identifying each document or item withheld, and stating the date, subject or title, the name and position of the person(s) from, and the person(s) to whom it was sent, and the name and position of any other recipient (to include all carbon copies or blind carbon copies), the nature of that information or material, and the basis for the claim of privilege and why that privilege applies.

**Confidential Business Information**

**All business confidential information must be submitted directly to the Office of Chief Counsel as described in the following paragraph and should not be sent to this office.** In addition, do not submit any business confidential information in the body of the letter submitted to this office. Please refer to PE21-020 in Tesla's response to this letter and in any confidentiality request submitted to the Office of Chief Counsel.

If Tesla claims that any of the information or documents provided in response to this information request constitute confidential commercial material within the meaning of 5 U.S.C. § 552(b)(4), or are protected from disclosure pursuant to 18 U.S.C. § 1905, Tesla must submit supporting information together with the materials that are the subject of the confidentiality request, in accordance with 49 CFR Part 512. Additional information can be found here: https://www.nhtsa.gov/coronavirus/submission-confidential-business-information.

If you have any questions regarding submission of a request for confidential treatment, contact Daniel Rabinovitz, Trial Attorney, Office of Chief Counsel at daniel.rabinovitz@dot.gov or (202) 366-8534.

**Due Date**

Tesla's response to this letter, in duplicate, together with a copy of any confidentiality request, must be submitted to this office by **November 1, 2021**. Tesla's response must include all non-confidential attachments and a redacted version of all documents that contain confidential information. If Tesla finds that it is unable to provide all of the information requested within the time allotted, Tesla must request an extension from me at (202) 366-5226 no later than five business days before the response due date. If Tesla is unable to provide all of the information requested by the original deadline, it must submit a partial response by the original deadline with whatever information Tesla then has available, even if an extension has been granted.

Please send email notification to Steven Posada at STEVEN.POSADA@DOT.GOV and to ODI_IRresponse@dot.gov when Tesla sends its response to this office and indicate whether there is confidential information as part of Tesla's response.

If you have any technical questions concerning this matter, please call Steven Posada of my staff at (202) 366-9402.

Sincerely,

Gregory Magno

Gregory Magno, Chief
Vehicle Defects Division - D
Office of Defects Investigation

# EXHIBIT 4

U.S. Department of Transportation
**National Highway Traffic Safety Administration**

**NHTSA**

1200 New Jersey Avenue SE.
Washington, DC 20590

October 12, 2021

**CERTIFIED AND ELECTRONIC MAIL**

Mr. Bill Berry
Vice President, Legal
Tesla, Inc.
3500 Deer Creek Road
Palo Alto, California 94304
bill.berry@tesla.com

Dear Mr. Berry:

In October 2020, Tesla released a feature called "Autosteer on City Streets" which the company also refers to as "Full Self-Driving" (FSD). FSD allows an equipped vehicle to drive to a destination chosen by the driver, expanding the use of "Navigate on Autopilot" to non-controlled surface streets. Tesla states that the system is able to detect and respond to stops signs and traffic signals and can carry out turns at intersections. To date, Tesla has released the feature to a limited number of employees and consumers pursuant to Tesla's early access beta release program, and is in the process of expanding access. Despite Tesla's characterization of FSD as "beta" it is capable of and is being used on public roads.

Recently, NHTSA has become aware of reports that participants in Tesla's FSD early access beta release program have non-disclosure agreements that allegedly limit the participants from sharing information about FSD that portrays the feature negatively, or from speaking with certain people about FSD. Given that NHTSA relies on reports from consumers as an important source of information in evaluating potential safety defects, any agreement that may prevent or dissuade participants in the early access beta release program from reporting safety concerns to NHTSA is unacceptable. Moreover, even limitations on sharing certain information publicly adversely impacts NHTSA's ability to obtain information relevant to safety.

In order to ensure that non-disclosure agreements regarding the FSD early access beta release do not interfere with NHTSA's ability to exercise its oversight responsibilities we are issuing the attached Special Order to Tesla.

NHTSA is charged under the National Traffic and Motor Vehicle Safety Act (Safety Act), 49 U.S.C. Chapter 301, with investigating potential defects that pose an unreasonable risk to motor vehicle safety. To carry out this responsibility it is imperative that NHTSA's access to relevant safety information is not hindered. To oversee compliance with the requirements of the

Safety Act and associated regulations, we are requiring that you provide the information in the attached Special Order. You must respond in full to the requests in the enclosed Special Order by **November 1, 2021**.

If you do not timely or completely respond to the Requests in the Special Order, you may be subject to civil penalties of up to $22,992 per day.

If you have any questions, please contact Thomas Healy of my staff at (202) 366-7161 or thomas.healy@dot.gov.

Sincerely,

*Ann E Carlson*

Ann Carlson
Chief Counsel

cc: Eric Williams, ewilliams@tesla.com
Beth Mykytiuk, emykytiuk@tesla.com

**UNITED STATES DEPARTMENT OF TRANSPORTATION**
**NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION**
1200 New Jersey Avenue SE
Washington, DC 20590

In re: )
)
PE21-020 )
Tesla, Inc. )
)

**SPECIAL ORDER DIRECTED TO TESLA, INC.**

To:
Mr. Bill Berry
Vice President, Legal
Tesla, Inc.
3500 Deer Creek Road
Palo Alto, California 94304
bill.berry@tesla.com

This Special Order is issued by the National Highway Traffic Safety Administration (NHTSA), an Operating Administration of the United States Department of Transportation, pursuant to 49 U.S.C. § 30166(g)(1)(A) and 49 C.F.R. §§ 510.7-510.8.[1]

As described in the accompanying letter and based on currently available information, NHTSA is concerned that Tesla may employ practices that could impede the agency's access to safety-related information, including information relevant to NHTSA's above-referenced investigation of Tesla vehicles. This concern is based on available information that suggests participants in the FSD early access beta release program may be prohibited or discouraged from

[1] *See* 49 C.F.R. §§ 1.95; 501.8(d)(3) (delegations of authority).

sharing certain information relevant to the performance of FSD, and therefore may also be prevented or dissuaded from submitting information regarding the safety of FSD to NHTSA. Accordingly, this Special Order now demands certain information from Tesla.

Tesla's response to this Special Order must be provided to NHTSA's Office of Chief Counsel by November 1, 2021. The response should be sent to Thomas Healy, Office of Chief Counsel, at Thomas.Healy@dot.gov or, for large submissions, through the DOT Secure Large File Transfer Solution system.[2]

Tesla's response must be signed under oath, *i.e.*, accompanied by a declaration, signed by a responsible officer of Tesla, stating that he/she has undertaken and directed an inquiry reasonably calculated to assure that the answers and production of documents are complete and correct, that he/she has caused the documents of Tesla to be searched diligently for information and documents responsive to this Special Order and produced them to NHTSA, and that the answers to the inquiries provided to NHTSA respond completely and correctly to this Special Order. 28 U.S.C. § 1746; 49 U.S.C. § 30166(g)(1)(A); 49 C.F.R. § 510.7.

Failure to respond fully or truthfully to this Special Order may result in a referral to the United States Department of Justice for a civil action to compel responses, and may subject Tesla to civil penalties of up to $22,992 per day, up to a maximum penalty of $114,954,525 for a related series of daily violations. 49 U.S.C. §§ 30163(a)(1), 30165(a)(3); 49 C.F.R. § 578.6(a)(3). Falsifying or withholding information in response to this Special Order may also lead to criminal penalties of a fine or imprisonment of up to 15 years, or both. 49 U.S.C. § 30170(a)(1).

---

[2] In order to use the File Transfer System, please email Thomas.Healy@dot.gov for a link.

## DEFINITIONS

Unless otherwise stated in the text, the following definitions apply to the information request set forth below:

- **Tesla:** means all of its past and present officers and employees, whether assigned to its principal offices or any of its field or other locations, including all of its divisions, parent corporations at any tier, subsidiaries (whether or not incorporated) at any tier, and affiliated enterprises and all of their headquarters, regional, zone and other offices and their employees, and all agents, contractors, consultants, attorneys and law firms and other persons engaged directly or indirectly (e.g., employee of a consultant) by or under the control of Tesla (including all business units and persons previously referred to).

- **Agent:** means an individual, such as a representative, who is authorized to act for or in place of another.

- **Describe:** means to provide, with respect to any act, occurrence, transaction, event, statement, communication, or conduct (hereinafter, collectively, "act"), all facts concerning any such act, including, but not limited to, a description of each act, and the date, the location, and the names and addresses of all persons involved.

- **Early access beta release:** means the capability to use FSD in a Tesla vehicle.

- **Employee:** means a person who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance.

- **FSD:** means Tesla "Full Self-Driving," also referred to by Tesla as "Autosteer on City Streets."

- **Officer:** means a person who holds an office of trust, authority, or command, such as a person elected or appointed by the board of directors to manage the daily operations of a corporation, such as a CEO, president, secretary, or treasurer.

- **You or Your:** means Tesla or Tesla's.

- **Non-disclosure agreement:** Any agreement or license, whether signed or otherwise accepted, between Tesla and any participant in Tesla's FSD early access beta release program, including Tesla employees, that by its terms limits or discourages in any way the early access beta release participant from sharing information about or discussing, with any person outside of Tesla, any aspect of FSD.

- **<u>Document</u>**: "Document(s)" is used in the broadest sense of the word and shall mean all original written, printed, typed, recorded, or graphic matter whatsoever, however produced or reproduced, of every kind, nature, and description, and all non-identical copies of both sides thereof, including, but not limited to, papers, letters, memoranda, correspondence, communications, electronic mail (e-mail) messages (existing in hard copy and/or in electronic storage), faxes, mailgrams, telegrams, cables, telex messages, notes, annotations, working papers, drafts, minutes, records, audio and video recordings, data, databases, other information bases, summaries, charts, tables, graphics, other visual displays, photographs, statements, interviews, opinions, reports, newspaper articles, studies, analyses, evaluations, interpretations, contracts, agreements, jottings, agendas, bulletins, notices, announcements, instructions, blueprints, drawings, as-builts, changes, manuals, publications, work schedules, journals, statistical data, desk, portable and computer calendars, appointment books, diaries, travel reports, lists, tabulations, computer printouts, data processing program libraries, data processing inputs and outputs, microfilms, microfiches, statements for services, resolutions, financial statements, governmental records, business records, personnel records, work orders, documents generated through litigation, arbitration, or mediation, pleadings, mediation statements, discovery in any form, affidavits, motions, responses to discovery, all transcripts, administrative filings and all mechanical, magnetic, photographic and electronic records or recordings of any kind, including any storage media associated with computers, including, but not limited to, information on hard drives, floppy disks, backup tapes, and zip drives, electronic communications, including but not limited to, the Internet and shall include any drafts or revisions pertaining to any of the foregoing, all other things similar to any of the foregoing, however denominated by Tesla, any other data compilations from which information can be obtained, translated if necessary, into a usable form and any other documents. For purposes of this request, any document which contains any note, comment, addition, deletion, insertion, annotation, or otherwise comprises a non-identical copy of another document shall be treated as a separate document subject to production. In all cases where original and any non-identical copies are not available, "document(s)" also means any identical copies of the original and all non-identical copies thereof. Any document, record, graph, chart, film or photograph originally produced in color must be provided in color. Furnish all documents whether verified by Tesla or not. If a document is not in the English language, provide both the original document and an English translation of the document.

- **<u>Other Terms</u>**: To the extent that they are used in these information requests, the terms "claim," "dealer field report," "field report," "fire," "fleet," "good will," "make," "model," "model year," "notice," "property damage," "property damage claim," "rollover," "type," "warranty," "warranty adjustment," and "warranty claim," whether used in singular or in plural form, have the same meaning as found in 49 C.F.R. § 579.4.

## INSTRUCTIONS

Please follow the instructions below when providing responses to the numbered information requests in the next section.

1. Your response to the Special Order shall be sent to Office of the Chief Counsel (NCC-100), National Highway Traffic Safety Administration by email to Thomas Healy at Thomas.healy@dot.gov or through the DOT Secure Large File Transfer Solution system.[3]

2. Please repeat the applicable request verbatim above your response. After your response to each request, identify the source of the information and indicate the last date the information was gathered.

3. When documents are produced and the documents would not, standing alone, be self-explanatory, the production of documents shall be supplemented and accompanied by explanation. Please also be reminded that where a document responsive to a request is not in the English language, both the original document and an English translation of the document must be produced.

4. You are required to respond to every request listed in this Special Order. If you cannot respond to any specific request or subpart(s) thereof, please state the reason why you are unable to do so. If you are unable to respond because you do not have all or any of the precise information needed to respond, provide an estimate. If, on the basis of attorney-client, attorney work product, or other privilege, you do not submit one or more requested documents or items of information in response to this Special Order, you must provide a privilege log identifying each document or item withheld, and stating the date, subject or title, name and position of the

[3] In order to use the File Transfer System, please email Thomas.Healy@dot.gov for a link.

person(s) from, and the person(s) to whom it was sent, and the name and position of any other recipient (to include all carbon copies or blind carbon copies), the nature of that information or material, and the basis for the claim of privilege and why that privilege applies.

5. After your response to each request, state whether you previously had any responsive documents that are no longer within your possession, custody, or control, including but not limited to because the documents were lost or destroyed. If such documents ever existed: describe the documents; identify the reason that the documents are no longer in your possession, custody, or control; identify the date that you last had the documents; and identify who may have copies of such documents.

6. If you claim that any of the information or documents provided in response to this Special Order constitutes confidential commercial material within the meaning of 5 U.S.C. § 552(b)(4), or is protected from disclosure pursuant to 18 U.S.C. § 1905, you must submit supporting information together with the materials that are the subject of the confidentiality request, in accordance with 49 C.F.R. Part 512, to the Office of Chief Counsel (NCC-100), National Highway Traffic Safety Administration as instructed below.

7. To facilitate social distancing due to COVID-19, NHTSA is treating electronic submission as an acceptable method for submitting confidential business information (CBI) to the agency under 49 C.F.R. Part 512.[4] Since Part 512 submissions are handled by NHTSA's Office of Chief Counsel, any Part 512 submission should be sent to the Office of Chief Counsel electronically. Specifically, any CBI submissions sent via email should be sent to Thomas Healy at Thomas.Healy@dot.gov.

---

[4] *See* https://www.nhtsa.gov/coronavirus/submission-confidential-business-information.

At this time, regulated entities should not send a duplicate hardcopy of their electronic CBI submissions to DOT headquarters. Please note that these modified submission procedures are only to facilitate continued operations while maintaining appropriate social distancing due to COVID-19. Regular procedures for Part 512 submissions will resume upon further notice, when NHTSA and regulated entities discontinue operating primarily in telework status.

For questions about CBI issues, including these modified submission procedures, please contact Dan Rabinovitz in the Office of Chief Counsel at Daniel.Rabinovitz@dot.gov or 202-366-8534.

8. All documents shall be produced electronically, as described below, in a common format (*e.g.*, Word, PDF, Microsoft Access) or other electronic formats commonly used by Tesla and discernable to NHTSA.

a. Hard copy documents shall be imaged in PDF format. They shall be provided as multi-page PDFs with document level optical character recognition (OCR).

b. Electronically Stored Information (ESI) shall be produced in native format (*e.g.*, Microsoft Excel) or converted to multi-page PDFs and produced along with document level OCR/extracted text.

c. You shall organize the documents by request number and as instructed in the request to which it responds or, if no instruction is given in a request, in chronological order by project, report, or other similar categorization responsive to that numbered request.

d. After the documents are so organized, and in sequential order to the request to which each responds, you shall apply Bates Numbers to the entire production.

e. You shall produce an index that lists the title of each document produced, the

Bates Numbers on the document, and the request to which it corresponds.

9. When a request calls for a detailed, narrative response, do not identify business records or other documents in lieu of providing a written narrative. A response to a request for a written narrative that solely directs NHTSA to documents will be considered non-responsive, and may result in civil penalties. 49 U.S.C. §§ 30163(a)(1), 30165(a)(3); 49 C.F.R. § 578.6(a)(3). A response to a request for a detailed, narrative response that includes references to specific Bates Number(s) in addition to a written narrative will not be considered a violation of this Instruction.

10. The singular includes the plural; the plural includes the singular. The masculine gender includes the feminine and neuter genders; and the neuter gender includes the masculine and feminine genders. "And" as well as "or" shall be construed either disjunctively or conjunctively, to bring within the scope of this Special Order all responses that might otherwise be construed to be outside its scope. "Each" shall be construed to include "every" and "every" shall be construed to include "each." "Any" shall be construed to include "all" and "all" shall be construed to include "any." The use of a verb in any tense shall be construed as the use of the verb in a past or present tense, whenever necessary to bring within the scope of the document requests all responses which might otherwise be construed to be outside its scope.

11. Tesla's response to this Special Order must be under oath, *i.e.*, accompanied by an declaration, signed by a responsible officer of Tesla, stating that he/she has undertaken and directed an inquiry reasonably calculated to assure that the answers and production of documents are complete and correct, that he/she has caused the documents of Tesla to be searched diligently for information and documents responsive to this Special Order and produced them to NHTSA,

and that the answers to the inquiries provided to NHTSA respond completely and correctly to this Special Order.

12. The requests in this Special Order are deemed to be continuing in nature so as to require additional or amended responses from you should you obtain or become aware of any new, additional, or differing responsive information or documents.

**REQUESTS**

1. Describe the manner in which non-disclosure agreements between Tesla and FSD early access beta release program participants are executed, i.e. whether via acceptance of terms of use, electronic signature, physical signature or by some other means. State whether the manner in which Tesla employee and Tesla non-employee participants execute the FSD non-disclosure agreement differs.

2. Provide a copy of any non-disclosure agreement(s) entered into with any non-employee participant in the early access beta release of FSD.

3. Provide a copy of any non-disclosure agreement(s) entered into with any employee participant in the early access beta release of FSD.

4. State whether Tesla requires vehicle owners to agree (whether through a contract, license or terms of use agreement, or otherwise) as a condition of use of Autopilot to any terms that would prevent or discourage vehicle owners from sharing information about or discussing any aspect of Autopilot with any person other than Tesla. Produce a copy of any such agreement(s) with such terms.

Dated: October 12, 2021

Ann E Carlson

Ann Carlson
Chief Counsel